Estate of Gregg Maxcy, Jessie L. Maxcy and Reverend George C. Stulting, Co-administrators, Petitioners v. Commissioner of Internal Revenue, Respondent. Estate of Hugh G. Maxcy, Jessie L. Maxcy and Reverend George C. Stulting, Co-executors, Petitioner v. Commissioner of Internal Revenue, Respondent.
Estate of Maxcy v. Commissioner
Docket Nos. 376-65, 5869-67.
United States Tax Court
T.C. Memo 1969-158; 1969 Tax Ct. Memo LEXIS 137; 28 T.C.M. (CCH) 783; T.C.M. (RIA) 69158; July 31, 1969. Filed Robert O. Rogers, for the petitioners. Marshall H. Barkin and J. Patrick McElroy, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: In these consolidated cases, respondent has determined deficiencies in petitioners' estate taxes as follows: Docket No.
Name
Deficiency
376-65
Estate of Gregg Maxcy, Jessie L. Maxcy and Reverend
George C. Stulting, Co-Administrators
$385,696.05
5869-67
Estate of Hugh G. Maxcy, Jessie L. Maxcy and Reverend
George C. Stulting, Co-Executors
68,109.22
Concessions having been made by both parties, the only issues remaining for decision are: 1. The number of Maxcy Securities, Inc. shares owned by Gregg Maxcy (hereinafter sometimes referred to as Gregg) and Hugh Maxcy (hereinafter sometimes referred to as Hugh) at the times of their deaths (the parties agree that our decision in regard to Gregg's *139 ownership will determine Hugh's ownership); 2. The fair market value of Gregg Maxcy's and Hugh Maxcy's Maxcy Securities shares on the valuation dates of their respective estates; 3. The amount of life insurance proceeds which qualify for the marital deduction from Gregg's gross estate. Findings of Fact Some of the facts are stipulated and they are so found. Those facts relevant to an understanding of the issues remaining in dispute are set forth below. Petitioner, Estate of Gregg Maxcy, Jessie L. Maxcy and Reverend George C. Stulting, Co-Administrators, had its principal office in Sebring, Florida at the time its petition in the instant case was filed. Gregg Maxcy died on August 10, 1960, and his United States Estate Tax Return, electing valuation of his estate at the alternate valuation date of August 10, 1961, was filed with the district director of internal revenue, Jacksonville, Florida. Petitioner, Estate of Hugh G. Maxcy, Jessie L. Maxcy and Reverend George C. Stulting, Co-Executors, had its principal residence in Sebring, Florida at the time its petition in the instant case was filed. Hugh Maxcy, Gregg's son, died on May 24, 1963, and his United States Estate Tax *140 Return, valuing his gross estate as of the date of his death, was filed with the district director of internal revenue at Jacksonville, Florida. At the date of trial Gregg's wife, Jessie Maxcy (hereinafter sometimes referred to as Jessie), had title to all assets in Gregg's and Hugh's estates remaining at Hugh's death. Gregg died intestate and under Florida law Jessie was entitled to one-half of his assets subject to probate and Hugh was entitled to the other half. Hugh died testate [1] and under his will Jessie received all of his assets. Hugh's wife, LaFaye Maxcy, was granted a dower interest under section 731.34 of the Florida statutes, but her interest was subsequently purchased by Jessie. At the times of their deaths, both Gregg and Hugh owned stock in Maxcy Securities, Inc., a Florida corporation. The corporation was organized on July 14, 1933, with a total authorized capital stock of 250 shares having no nominal or stated value. In August, 1933 the corporation's secretary, *141 Charlotte Varena, issued stock certificates to the subscribing shareholders in Maxcy; Certificate No. 1 for three shares of Maxcy Securities, Inc. stock was issued to Gregg, Certificate No. 3 for one share to Gregg's wife, Jessie, and Certificate No. 2 for one share to herself. Varena recorded the issuance of the shares in the corporation's stock 784 record book - the only record of the corporation's outstanding shares. At a special meeting of the newly formed corporation, held August 1, 1933, the corporation authorized an additional 245 shares of Maxcy stock to be issued to Gregg in return for various assets. Varena then issued Certificate No. 4 for 245 Maxcy shares in October, 1933 to Gregg, recorded its issuance in the corporation's stock record book, but dated the date of issuance back to August 1, 1933. Sometime thereafter, in either 1933 or 1934, Gregg endorsed Certificate No. 4 and turned it over to Varena, stating that he wished to transfer the 245 shares into three certificates calling for 80 shares to Hugh, 79 to Jessie, 82 shares to himself, and 4 shares to Varena. Varena then issued Certificates Nos. 5, 6, 7 and 8, respectively, in the above names and recorded the *142 issuance in the corporation's stock record book as a transfer of the 245 shares doted August 15, 1933. At the time, Gregg told Jessie that he was making a gift of 80 shares of Maxcy stock to Hugh and 79 shares to her. When the transfer of the 245 Maxcy shares was completed, Varena considered Certificate No. 4 canceled, though she made no marks on the certificate indicating that it was canceled. In 1949 Gregg and the corporation's accountants, Thomas and J. P. Cochran, had a conference in regard to Maxcy's capitalization. At that conference Gregg either stated or affirmed that he was the owner of 82 out of 245 outstanding Maxcy shares. Based on those figures Thomas Cochran recommended that the corporation's authorized capital stock be increased to 500 shares and that stock be issued in exchange for the corporation's liabilities to the then current shareholders. Pursuant to his suggestion Maxcy Securities' certificate of incorporation was amended on October 8, 1949, to increase its authorized capital stock to 500 shares. No stock, however, was subsequently issued in satisfaction of those liabilities. In 1951 Hugh surrendered to Varena Certificate No. 5 representing 80 shares in satisfaction *143 of certain debts which he owed to the corporation. The certificate was endorsed by Hugh and when he turned the certificate over to Varena she considered it canceled. In 1953 Varena issued Certificate No. 9 for four shares of Maxcy Securities to Hugh and recorded the issuance in the corporation's stock record book. The record is silent as to the reason for this transaction. At the time certificates were issued, Florida law required the purchase of documentary stamps and Varena purchased stamps for all certificates issued, though not all were placed in the corporation's stock record book. At the time of Gregg's death, all certificates (with the exception of No. 9 which had been pledged as security with a bank) in the names of Gregg, Hugh and Jessie were in Maxcy Securities' vault. Included were canceled Certificates Nos. 4 and 5. The only individuals having access to the vault were Gregg, Hugh and Varena. Jessie did not know the combination to the vault and had never had any Maxcy certificates in her possession. At the date of Gregg's death there were 174 shares of Maxcy Securities outstanding, consisting of Certificates Nos. 1, 2, 3, 6, 7, 8 and 9. However, due to lapse of memory, *144 inefficiency, carelessness, or confusion (on the part of Maxcy's officers, its attorneys and accountants, and internal revenue service agents), inconsistent amounts of outstanding Maxcy shares or their ownership were reported on various documents. Maxcy Securities' minutes prepared by Varena for August 31, 1940, subsequent to the transfer of 80 Maxcy Securities shares to Hugh, stated the following: The following Directors and Officers, constituting all of the Stockholders were present: Gregg Maxcy, J. L. Maxcy, and C. M. Varena. Similar statements appeared in the minutes for January 14, 1939, and January 12, 1940, also prepared by Varena. The statements were in error, as Hugh was a shareholder but not a director. The minutes for September 15, 1941 and thereafter show that Hugh was elected as a member of the board of directors and was a shareholder of Maxcy Securities. After Gregg's death, the attorney for his estate, M. L. Esarey (hereinafter sometimes referred to as Esarey), obtained all of the stock certificates in Gregg Maxcy's name from Varena. Included was the certificate for 245 Maxcy Securities shares which had been turned into the corporation by Gregg. Though the certificate *145 had been endorsed by Gregg, Esarey did not examine the corporation's stock record book and consequently she was unaware that the certificate no longer represented outstanding Maxcy Securities shares. When she prepared the inventory of assets for probate, 785 she reported Gregg as owning 330 Maxcy Securities shares. Varena, as administrator, signed the report. The inventory was subsequently used as the basis for Hugh's inventory, Jessie's purchase of LaFaye Maxcy's dower interest, and certain Maxcy Securities' minutes which were prepared by Esarey. Though Esarey subsequently became aware that Gregg might not have owned as many as 330 Maxcy shares, she did not raise the issue in subsequent proceedings due to pending family disputes and the possibility of litigation. For the years 1934 through 1967, Maxcy Securities filed documents titled "Corporate Report and Tax Return for Foreign and Domestic Corporations" with the Secretary of State of the State of Florida. On those returns a question was asked pertaining to the number of shares of the corporation's outstanding stock. The following shows the number of shares which Maxcy reported during those years: Year
No. of SharesOutstanding
1934
250
1935
250
1936
250
1937
250
1938
250
1939
250
1940
250
1941
250
1942
250
1943
250
1944
250
1945
250
1946
250
1947
250
1948
250
1949
250
1950
314.2
1951
314.2
1952
314.2
1953
314.2
1954
314.2
1955
314.2
1956
314.2
1957
314.2
1958
314.2
1959
314.2
1960
314.2
1961
314.2
1962
314.2
1963
419
1964
419
1965
419
1966
419
1967
419
*146 The returns were prepared by Thomas or J. P. Cochran whose general practice was simply to report the number of shares shown for the previous year. The figure 314.2 shares shown from 1950 through 1962 was based on Thomas' erroneous assumption that additional shares had been issued in exchange for the corporation's liabilities. The figure 419 shares shown for the years 1963 through 1967 was based on information received from a revenue agent, Alberti, that there actually were 419 shares outstanding. Thomas never made an independent examination of the stock record book to verify any of the figures which were used. On Maxcy Securities' Corporate Income Tax Returns for the years ending July 31, 1934 through July 31, 1967, the following information as to stock ownership was shown: For the years 1940 and 1941 Gregg's ownership was shown as 99 percent. The other years did not show any percentage ownership. The 1940 return was the first return prepared by J. P. Cochran, but all returns were prepared by accountants. Gregg signed all of the returns prior to his death. Varena co-signed the 1940 and 1941 returns and Hugh was the sole signatory on the 1961 return. The return forms for 1938 *147 through 1967 asked whether any corporation, individual, partnership, trust or association at any time during the taxable year owned directly or indirectly 50 percent or more of the corporation's voting stock. The question for the years 1944, 1945, 1949, 1950, 1952, 1953, 1955 and 1956, and 1958 through 1963 was answered "no;" for 1964 through 1967 it was answered "yes," and for the other years the question was left blank. Where the question was answered "yes," the owner shown was Estate of Gregg Maxcy - 70.8 percent in 1964, and Estate of Gregg Maxcy - 78.75 percent in 1965 through 1967. This later figure was based on a figure computed by Thomas Cochran of 330 shares out of 419 outstanding. J. P. Cochran, who died March 3, 1963, prepared the "United States Estate Tax Return" for the estate of Gregg Maxcy. Schedule B (Stocks and Bonds) of that return listed 330 Maxcy Securities shares valued at $495.165. Thomas Cochran prepared the "United States Estate Tax Return" for the estate of Hugh Maxcy and on Schedule B listed 169 Maxcy Securities shares valued at $712,335. Thomas calculated Hugh's Maxcy Securities' ownership by dividing the 330 shares shown on the estate tax return for *148 Gregg by two and adding the four shares represented by Certificate No. 9. In his statutory notice of deficiency to the Estate of Gregg Maxcy, respondent determined that Gregg owned 330 Maxcy Securities shares. In its original petition, 786 petitioner, Estate of Gregg Maxcy, alleged ownership of 330 Maxcy Securities shares. By amended petition it now claims that Gregg owned only 85 shares of Maxcy Securities stock. By an amended answer to the petition as amended, respondent contended that Gregg owned 330 out of 419 shares, or in the alternative 248 out of 254 shares, or as a third alternative 168 out of 174 shares outstanding at the date of his death. On brief respondent alternatively contends that Gregg owned 248 out of 254 shares, or 164 out of 174 shares. The parties agree that on the date of his death Hugh owned one-half the number of Maxcy Securities shares owned by Gregg plus the four shares represented by Certificate No. 9. At the date of his death, Gregg Maxcy owned 164 shares out of 174 shares outstanding. During the period from Gregg's death to Hugh's death, Maxcy Securities was engaged in the citrus fruit and cattle raising business, though the latter was being *149 phased out. The corporation owned 18 citrus groves, of which three were contiguous to each other and the other 15 noncontiguous. In addition the corporation owned a truck-stop restaurant, mortgages and accounts receivables. The net fair market value of the corporation's individual assets on August 10, 1961 is stipulated at $2,043,977.97, computed as follows: Assets:
Cash
$ 7,799.03
Accounts, Notes and Mortgages Receivable (net of capital gains tax on installment sale (deferred income of $40,799.72))
436,277.59
Inventories
3,445.40
Stocks and Bonds
700.00
Cattle
16,950.76
Horses
3,400.00
Citrus Groves (18)
347,700.00
Acreage and undeveloped lots
1,131,400.00
Moore Haven Ranch
262,500.00
Plant and Equipment 77,260.00
Total Assets
$2,287,432.78
Liabilities:
Accounts Payable
$ 69,974.20
Notes and Mortgages Payable
162,190.11
Income Tax Payable 11,290.50
Total Liabilities $ 243,454.81
NET WORTH $2,043,977.97 On May 24, 1963 (the date of Hugh G. Maxcy's death) net fair market value of the assets was Maxcy's death), it is stipulated that the $1,915,686.57, computed as follows: Assets:
Cash
$ 8,410.52
Accounts, Notes and Mortgages Receivable (net of capital gains tax on installment sale (deferred income of $28,012.24))
433,141.61
Inventories
829.46
Other Current Assets
1,473.13
Citrus Groves (18)
372,300.00
Acreage and Undeveloped Lots
1,226,700.00
Plant and Equipment
75,000.00
Other Assets 3,046.58
Total Assets
* $2,121,601.30
Liabilities:
Accounts Payable
$ 43,166.07
Notes and Mortgages Payable
91,502.98
Other Liabilities 71,245.68
Total Liabilities 205,914.73
NET WORTH $1,915,686.57
*150 787 On each of the above dates, there was no goodwill attaching to the corporation's assets which would have enhanced the value of Maxcy Securities shares. Due to the nature of the various assets, there was a relatively small market for prospective purchasers of Maxcy Securities shares, because few buyers would have been interested in acquiring an interest in all of the properties which it owned - as opposed to individuals interested in purchasing one or two of the properties. Also the corporation's shares were less desirable than its underlying assets, because a potential purchaser of its shares faced the possibility of contingent, or hidden corporate liabilities. On each of the above dates a majority interest in Maxcy Securities was worth 85 percent of the interest's proportionate claim to the fair market value of the corporation's assets. A minority interest was worth only 75 percent of a majority interest due to the undesirability of a minority interest in a closely held corporation. At the time of his death, Gregg was the owner *151 of the following life insurance policies on his life, which policies had been assigned to the Bank of the Commonwealth, Detroit, Michigan, to secure a loan of $38,755.86: Company
Number
Value
New York Life Insurance Co.
10162811
$24,063.50
Mutual Life Insurance Co.
3023015
12,469.21
Central Life Assurance Life Society
84878
4,000.00
The assignments were all executed on forms similar to the following: ASSIGNMENT OF LIFE INSURANCE POLICY AS COLLATERAL A. FOR VALUE RECEIVED the undersigned hereby assign, transfer and set over to Bank of the Commonwealth of Detroit, Michigan its successors and assigns, (herein called the "Assignee") Policy No. 10162811 issued by the New York Life Insurance Company, New York, New York ( herein called the "Insurer") and any supplementary contracts issued in connection therewith (said policy and contracts being herein called the "Policy"), upon the life of Gregg Maxcy of Sebring, Florida and all claims, options, privileges, rights, title and interest therein and thereunder (except as provided in Paragraph C hereof), subject to all the terms and conditions of the Policy and to all superior liens, if any, which the Insurer *152 may have against the Policy. The undersigned by this instrument jointly and severally agree and the Assignee by the acceptance of this assignment agrees to the conditions and provisions herein set forth. B. It is expressly agreed that, without detracting from the generality of the foregoing, the following specific rights are included in this assignment and pass by virtue hereof: 1. The sole right to collect from the Insurer the net proceeds of the Policy when it becomes a claim by death or maturity; 2. The sole right to surrender the Policy and receive the surrender value thereof at any time provided by the terms of the Policy and at such other times as the Insurer may allow; 3. The sole right to obtain one or more loans or advances on the Policy, either from the Insurer or, at any time, from other persons, and to pledge or assign the Policy as security for such loans or advances; 4. The sole right to collect and receive all distributions or shares of surplus, dividends deposits or additions to the Policy now or hereafter made or apportioned thereto, and to exercise any and all options contained in the Policy with respect thereto; provided, that unless and until the Assignee *153 shall notify the Insurer in writing to the contrary, the distributions or shares of surplus, dividend deposits and additions shall continue on the plan in force at the time of this assignment; and 5. The sole right to exercise all nonforfeiture rights permitted by the terms of the Policy or allowed by the Insurer and to receive all benefits and advances derived therefrom. C. It is expressly agreed that the following specific rights, so long as the Policy has not been surrendered, are reserved and excluded from this assignment and do not pass by virtue hereof: 1. The right to collect from the Insurer any disability income; 2. The right to designate and change the beneficiary; 3. The right to elect optional modes of settlement; but the reservation of these rights shall in no way impair the right of the Assignee to surrender the Policy completely with all its incidents or impair any other right of the Assignee hereunder, and any designation or change of beneficiary or election of a mode of settlement shall be made subject to this assignment and to the rights of the Assignee hereunder. D. This assignment is made and the Policy is to be held as collateral security for any and *154 all liabilities of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter 788 arise in the ordinary course of business between any of the undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "Liabilities"). It is expressly agreed that all sums received by the Assignee hereunder, either in event of death of the insured, the maturity or surrnder [sic] of the Policy, the obtaining of a loan or advance on the Policy, or otherwise, shall first be applied to the payment of one or more of the following in such order of preference as the Assignee shall determine: (a) principal of and/or interest on Liabilities; (b) premiums on the Policy; (c) principal of and/or interest on loans or advances made by the Insurer on the Policy. E. The Assignee covenants and agrees with the undersigned as follows: 1. That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities shall be paid by the Assignee to the persons entitled thereto under the terms of the Policy had this assignment not been executed; 2. That the Assignee will not exercise either the right *155 to surrender the Policy or (except for the purpose of paying premiums) the right to obtain policy loans from the Insurer, until there has been default in any of the Liabilities or a failure to pay any premium when due, nor until twenty days after the Assignee shall have mailed, by first-class mail, to the undersigned at the address given hereinbelow, notice of intention to exercise such right; and 3. That the Assignee will upon request forward without unreasonable delay to the Insurer the Policy for endorsement of any designation or change of beneficiary or any election of an optional mode of settlement. F. The Insurer is hereby authorized to recognize the Assignee's claims to rights hereunder without investigating the reason for any action taken by the Assignee, or the validity or the amount of the Liabilities or the existence of any default therein, or the giving of any notice under Paragraph E(2) above or otherwise, or the application to be made by the Assignee of any amounts to be paid to the Assignee. The sole signature of the Assignee shall be sufficient for the exercise of any rights under the Policy assigned hereby and the sole receipt of the Assignee for any sums received *156 shall be a full discharge and release therefor to the Insurer. Checks for all or any part of the sums payable under the Policy and assigned herein, shall be drawn to the exclusive order of the Assignee if, when, and in such amounts as may be, requested by the Assignee. G. The Assignee shall be under no obligation to pay any premium, or the principal of or interest on any loans or advances on the Policy whether or not obtained by the Assignee, or any other charges on the Policy, but any such amounts so paid by the Assignee from its own funds, shall become a part of the Liabilities hereby secured, shall be due immediately, and shall draw interest at a rate fixed by the Assignee from time to time not exceeding 6% per annum. H. The exercise of any right, option, privilege or power given herein to the Assignee shall be at the option of the Assignee, but (except as restricted by Paragraph E(2) above) the Assignee may exercise any such right, option, privilege or power without notice to, or assent by, or affecting the liability of, or releasing any interest hereby assigned by the undersigned, or any of them. I. The Assignee may take or release other security, may release any party *157 primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities, or may apply to the Liabilities proceeds of the Policy hereby assigned or any amount received on account of the Policy by the exercise of any right permitted under this assignment, without resorting or regard to other security. J. In the event of any conflict between the provisions of this assignment and provisions of the note or other evidence of any Liability, with respect to the Policy or rights of collateral security therein, the provisions of this assignment shall prevail. K. Each of the undersigned declares that no proceedings in bankruptcy are pending against him and that his property is not subject to any assignment for the benefit of creditors. Signed and sealed this 16th day of June -, 1960. (Signed) C. M. Varena Witness (Signed) Hansel Oliver (Signed) Gregg Maxcy (L.S.) Insured or Owner Gregg Maxcy P.O. Box 191, Sebring, Florida
Address 789 The assignments were all recorded on the books of the respective insurance companies and pursuant thereto Gregg executed change of beneficiary forms for the Central Life *158 Assurance and the New York Life Insurance policies as follows: To be attached to policy when recorded and returned by Company CENTRAL LIFE ASSURANCE COMPANY Des Moines 6, Iowa
REVOCATION AND REDESIGNATION SUBJECT TO ASSIGNMENT Policy No. 84878 Insured Gregg Maxey [sic] I, Owner of said policy, hereby revoke the existing designation of beneficiary, both primary and contingent, if any, and the existing optional settlement provision, if any, under said policy, and I hereby request that said designation and optional settlement provision, if any, be immediately restored to full force and effect, subject and subordinate, however, to any indebtedness on account of said policy in favor of the insuring Company, and subject to the interest acquired by - BANK OF THE COMMONWEALTH, (Name of Assignee) DETROIT, MICHIGAN
(Address) , under an assignment dated (State) June 16, 1960 (Date) I hereby warrant that said policy is in my possession and control, or that of said assignee, and that no other person, firm or corporation (except said Company and/or said assignee) has any claim to an interest in said policy by virtue of any sale, assignment, pledge or otherwise. *159 I understand that this change shall not take effect until recorded at the Home Office of the Company, but when so recorded shall relate back and take effect as of the date of execution, without prejudice to the Company on account of any payment made by it before recording. I hereby request that any provision in said policy requiring that it be submitted to the Company for change of beneficiary be waived. Dated at Sebring, Florida (City and State) June 17, 1960 (Date) (Illegible) (Other required signatures) (Signed) Gregg Maxcy Signature of Owner RECORDED at Des Moines, Iowa
July 18, 1960 Date Central Life Assurance Company By (Signed) John A. Brenton Registrar CHANGE OF BENEFICIARY To be attached to Policy Number 10 162 811 on life of Gregg Maxcy The "Beneficiary" under the above numbered policy is hereby changed to BANK OF THE COMMONWEALTH, DETROIT, MICHIGAN AS THEIR INTEREST MAY APPEAR AND THE BALANCE OF THE PROCEEDS, IF ANY, TO JESSIE L. MAXCY, WIFE OF THE INSURED, OR IN THE EVENT OF HER DEATH TO HUGH G. MAXCY, SON OF THE INSURED. such change to be effective in accordance with the Change of Beneficiary provisions of said policy, hereby revoking *160 any settlement agreement or optional method of settlement election now in effect with respect to said policy. Date June 15, 1960 "IMPORTANT" - Please Date and Sign Both Forms (Signed) Gregg Maxcy Person(s) with right to change beneficiary Gregg did not execute a change of beneficiary form for the Mutual Life policy. The above policies remained in effect at Gregg's death and upon his death the policy proceeds, $40,613.47, passed to the Bank of the Commonwealth. The bank subsequently issued a check for $1,857.61 to Jessie Maxcy for the difference between the amount received and the $38,755.86 debt. On Gregg's Estate Tax Return, the $40,613.47 proceeds from the three policies were included in Gregg's gross estate and shown as qualifying for the marital deduction, and the $38,755.86 debt to the Bank of the Commonwealth was included as a deductible debt of decedent. In his statutory notice of deficiency, respondent, inter alia, disallowed any amount 790 of the life insurance proceeds as qualifying for the marital deduction. He also disallowed claimed accountants' fees of $9,600 and a claimed widow's allowance of $4,200 from the $169,529.22 figure shown as expenses and *161 debts, allowing "debts and charges" of $155,729.22. He then computed the marital deduction as follows: Returned
Determined
Marital Deduction
$233,923.34
$840,905.76
Since the net bequests and assets passing to the surviving spouse have been determined to be less than one-half of the adjusted gross estate, the marital deduction is limited to the actual amounts passing to the surviving spouse, computed as follows:
Gross estate as corrected
$2,314,632.33
Less: Debts and charges $155,729.22
Joint property to wife 30,000.00
Life insurance 80,532.71
Federal estate tax 373,807.06
Florida estate tax 52,751.83 692,820.82
Residuary estate
$1,621,811.51
1/2 of residue to wife
810,905.76
Plus: Joint property to wife 30,000.00
Allowable marital deduction
$ 840,905.76
Note: None of the life insurance proceeds qualify for the marital deduction.
Respondent now concedes that $1,857.61 of the life insurance proceeds qualifies for the marital deduction. Ultimate Finding of Fact The $38,755.86 life insurance proceeds do not qualify for the marital deduction, but for purposes of computing the amount of assets passing to his wife, they *162 do reduce Gregg's probate estate's liabilities by that amount. Opinion These cases arise under section 2031 and 2032 of the Internal Revenue Code. [2]
Gregg Maxcy died on August 10, 1960, leaving one-half of his estate to his son, Hugh Maxcy. Hugh died May 24, 1963. The question common to their estates is the number of Maxcy Securities *163 shares which Gregg owned at the date of his death. The parties have agreed that Hugh's ownership of Maxcy Securities shares will be derived from our finding as to the number of shares owned by Gregg. When Maxcy Securities was formed, Gregg received Certificate No. 1 for three shares, his wife Jessie and the corporation's secretary, Charlotte Varena, received Certificates Nos. 2 and 3 for one share each. Shortly thereafter Gregg received Certificate No. 4 for 245 shares. The first issue is whether Gregg transferred Certificate No. 4 for Certificates Nos. 5, 6, 7 and 8, issued in the names of Hugh Maxcy, J. L. Maxcy, Gregg Maxcy and C. M. Varena, respectively, which also totaled 245 shares), or whether Certificates Nos. 5, 6, 7 and 8 were issued in addition to Certificate No. 4. We have found that Certificate No. 4 was exchanged for Certificates Nos 5, 6, 7 and 8. Respondent contends that Certificate No. 4 was not transferred, redeemed, or canceled, and in support of his position points out that the certificate shows no cancellation marks on its face and that various official reports were at least partially consistent with the certificate's continued validity. As shown in the findings *164 of fact, the various reports were inconsistent. The testimony presented at trial by those preparing the statements was to the effect that they all failed to make a conscientious effort to verify any particular number of shares outstanding. As a result, we find those reports to have little probative value as to the stock ownership issue. The most important record, the corporation's stock record book, was in evidence. 791 The entries therein specifically show that Certificates Nos. 5, 6, 7 and 8 were issued in exchange for Certificate No. 4. Charlotte Varena was in charge of the book. She testified that Certificate No. 4 was to be canceled upon issuance of Certificates Nos. 5, 6, 7 and 8, and that she considered her receipt of Certificate No. 4 as sufficient to cancel it. Though Varena's testimony indicated some confusion on her part where correctness of dates and amounts were concerned, she stated that Gregg intended to transfer the 245 shares and we are convinced that the entries showing a transfer of 245 shares correctly reflected the actual transaction. The total of 245 shares represented by Certificates Nos. 5 through 8 is consistent with an exchange of 245 shares and *165 under the circumstances is more than simply coincidentally equal to the shares represented by Certificate No. 4. We note that Gregg himself stated that there were only 245 Maxcy Securities shares outstanding in 1949 and that he owned 82. Though the noncanceled outstanding certificates (excluding Certificate No. 4) represented 250 shares and those in Gregg's name totaled 85, Gregg's statement still indicates that he had surrendered Certificate No. 4 to the corporation. Both parties point out that an additional issue of 245 shares by the corporation in 1933 or 1934 would have been in violation of its charter which only authorized 250 shares. Further, an issuance of additional shares would almost certainly have been accompanied by a corporate resolution and the corporation's official minutes contained no such resolution. Consequently we find and hold from the entire record that the 245 shares in issue were transferred from Certificate No. 4 and Certificate No. 4 was redeemed by the corporation. Gregg's signature appears on the back of Certificate No. 4 and under Florida law (Fla. Stat. Ann. sec. 614.22 (1955)), this was sufficient endorsement. The certificate was delivered to Varena *166 for cancellation. She, as secretary of the corporation, considered it canceled and issued Certificates Nos. 5, 6, 7 and 8 in exchange. The parties agree that our finding that Certificate No. 4 was canceled means that there were 174 Maxcy Securities shares outstanding at the date of Gregg's death. Respondent contends, however, that even if Certificate No. 4 were transferred for Certificates Nos. 5, 6, 7 and 8, the 79 shares represented by Certificate No. 6 in Jessie Maxcy's name remained Gregg's shares as the certificate was never delivered. We agree. Jessie testified that she never had any Maxcy stock certificates in her possession and the evidence presented established that at all times stock Certificate No. 6 in Jessie's name remained in Maxcy's Securities' vault, inaccessible to Jessie. As a result we find and hold that Certificate No. 6 was never physically delivered into Jessie's possession. Petitioners point out that Gregg had intended to make a gift of the 79 shares represented by Certificate No. 6 and had caused the transfer to be entered on the corporation's books. They cite 38 Am. Jur. 2d 856, sec. 51; 99 A.L.R. 1077, 152 A.L.R. 427, 23 A.L.R. 2d 1173, *167 and the cases cited therein for the proposition that as a general rule this act is sufficient to transfer the shares to the person named on the certificate even if no physical delivery of the certificates has taken place. Contending that there are no Florida cases on point, they ask us to find that the general rule is that of Florida and to hold that Certificate No. 6 was effectively transferred to Jessie. They distinguish cases arising under the Florida Uniform Stock Transfer Act as being inapplicable since that act was not adopted until 1943. Fla. Stat. Ann. sec. 614.03 (1955). We agree that there are no Florida cases identical to the situation in the instant case. But there are Florida cases which deal with the necessity of delivery of certificates to effect a valid transfer of stock and those cases do not follow the "general rule" cited by petitioner for years both prior to and subsequent to the Stock Transfer Act's adoption. In Eulette v. Merrill, Lynch, Pierce, Fenner and Beane, 101 So. 2d 603 (Fla. Dist. Ct. App. 1958), the question was whether the plaintiff's grandfather who had purchased stock in the plaintiff's name in 1932 and 1936 had made a valid inter *168 vivos gift. Though there was some evidence in the case that the grandfather did not intend to make a gift at the time the stock was purchased, the District Court of Appeals did not rest its decision solely on that basis. It stated (pp. 605-606): We concur with the chancellor in his conclusions that the evidence fails to support a finding of intention on the part of Otto Kaspar to make a complete and 792 irrevocable surrender of dominion and control of the stock certificates sufficient to constitute a completed gift. Further, the essential requirement of delivery was not shown as the appellant not only did not possess the certificates, but had never seen them. Webster v. St. Petersburg Federal Savings & Loan Ass'n, 155 Fla. 412, 20 So. 2d 400; Barbash v. Barbash, Fla. 1952, 58 So. 2d 168. See also the Uniform Stock Transfer Act, Sec. 614.03, Fla. Stat., F.S.A., as to the requirement of delivery. Lacking the essential requirements of a valid gift inter vivos, the basis for the establishment of ownership and the appellant's recovery fails. And see also Pressman v. Merrill Lynch, Pierce, Fenner & Beane, 113 Ohio App. 70, 170 N.E. 2d 762 (Ohio Ct. App. 1960), *169 decided under Florida law. In Kuebler v. Kuebler, 131 So. 2d 211 (Fla. 1961), the District Court of Appeals reiterated the requirement that there must be delivery of a stock certificate for a valid transfer, even though the stock is in the name of another (p. 216): The mere act of Louis causing the 796 shares of stock to be re-issued in his name and that of appellant was not in and of itself sufficient to establish a complete gift and transfer of the shares either before or after the death of Louis, notwithstanding the wording of the above statutes. In order for the transaction to have been completed such that appellant could prevail here there must have been in addition to the re-issuance a donative intent, delivery of possession and surrender of dominion and control. Eulette v. Merrill, Lynch, Pierce, Fenner, and Beane, Fla. App. 1958, 101 So. 2d 603, 604. The court subsequently modified its opinion to remove the requirement of surrender of dominion and control where joint tenancy stock is in issue, a situation not present in the instant case. Giving "proper regard" to these relevant rulings, Commissioner v. Estate of Bosch, 387 U.S. 456 (1967), *170 we hold that under Florida law there is no inter vivos gift of stock without physical delivery of the certificates to the donee. Since no delivery of the 79 shares represented by Certificate No. 6 was made, we further find and hold that under Florida law title to those shares did not pass from Gregg to Jessie during Gregg's lifetime. Consequently, we have found that Gregg owned 164 out of 174 outstanding Maxcy Securities shares at the time of his death. The parties have agreed as to the value of the corporation's assets on the respective valuation dates for Gregg's and Hugh's estates, and those amounts are set forth in the findings of fact. The only remaining question is whether the fair market value of a majority ownership in Maxcy shares is to be discounted due to its lack of marketability. Two expert witnesses testified on behalf of petitioners and both stated that stock in corporations similar to Maxcy Securities were subject to a discount from the fair market value of their underlying assets. Daniel Downey, a CPA experienced in the acquisition of small businesses, testified that he *171 advised clients not to purchase a small corporation's stock, but to purchase its underlying assets to avoid liability for contingent or undisclosed corporation obligations. Marion McCune, an expert real estate appraiser, testified that in his opinion Maxcy Securities' stock on both valuation dates was subject to be so discounted because of the "pyramid" principle. He explained this principle as it applied to Maxcy Securities' assets as follows: In the pyramid there is a large number of people that could buy one of the groves, one of the lots, or one parcel, even the larger parcel of pasturage, but the likelihood, as you proceed upward in the pyramid of finding one person who would be interested in buying on the one hand a ranch, on the other hand six thousand eight hundred sixty-one acres of pastureland, lots, groves, is in the pyramid, in the upper end of the pyramid, and for this reason, any time you reduce the size of the market, you, without exception, encounter a discount in order to effect the sale. He concluded that a majority interest in Maxcy Securities would be worth 15 percent less than its proportionate share of the underlying assets' fair market value. He further *172 concluded that this amount must be reduced an additional 25 percent for a minority interest in Maxcy Securities. Respondent is in accord with a minority interest 25-percent discount "under the precise facts of this case," but opposes any discount of a majority interest, arguing that the owner of a majority interest could cause the corporation to liquidate and thensell the assets received piecemeal at their fair market value. Thus, respondent contends we should value a majority interest at its pro rata share of the fair market value of the underlying assets with no discount for the pyramid principle. Without deciding the validity of respondent's contention, we fail to see how this power to liquidate inherent in a majority interest requires a higher value than McCune's testimony indicates. Whether or not a purchaser of a controlling interest in Maxcy Securities could liquidate the corporation and sell its assets is immaterial, as there must still be found a purchaser of the stock who would be willing to undertake such a procedure. McCune's opinion was that this type of purchaser is relatively scarce and not easily found at a sales price more than 85 perscent of the assets' fair market *173 value. Section 20.2031-1(b), Estate Tax Regs., provides that: "The fair market value [of property] is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulstion to buy or sell and both having reasonable knowledge of relevant facts." In the instant case, we are attempting to determine the price a willing seller of Maxcy Securities shares could get from a willing buyer; not what the buyer may eventually realize. McCune's testimony impresses us as a rational analysis of the value of the stock in issue, and in the absence of contrary evidence, we find and hold on the facts here present that a majority interest in such stock was worth 85 percent of the underlying assets' fair market value on the respective valuation dates. See Wood v. United States, 29 F. Supp. 853 (Ct. Cl. 1939; Goss v. Fitzpatrick, 97 F. Supp. 765 (D. Conn. 1951). Since Hugh's share was a minority interest as of his death, the parties agree, and we find and hold that its per share value is 75 percent of that of a majority *174 interest. At the time of his death, Gregg had assigned three insurance policies in his name to the Bank of the Commonwealth, Detroit, Michigan, as security for a loan of $38,755.86. The beneficiary of all three policies was Gregg's wife Jessie, though two of the policies named the bank as beneficiary to the extent of the outstanding loan. After Gregg's death the bank collected the policy proceeds of $40,613.47 [3] from the respective insurance companies, applied $38,755.86 to the balance of Gregg's outstanding loan, and remitted the balance of $1,857.61 [3] to Jessie. Respondent concedes that the $1,857.61 [3] amount remitted to Jessie qualifies for the marital deduction under section 2056 of the Code. [4] The question remains whether the balance of the policy proceeds ($38,755.86) also qualifies as property which "has passed from the decedent to his surviving spouse." *175 Petitioners contend that under Florida law Gregg's estate was required to reimburse Jessie for the policy proceeds used to satisfy his debt. If such is the law in Florida, it is clear that the estate is entitled to the marital deduction with respect to the entire policy proceeds. Estate of D. Byrd Gwinn, 25 T. C. 31, 39, et seq. (1955); section 20.2056(b)-4(b), Estate Tax Regs. There are some jurisdictions which hold that where an insured assigns a life insurance policy on his life to a creditor as security, the policy's beneficiary obtains the creditor's rights against the estate through subrogation and is thus entitled to reimbursement from the estate for the policy's proceeds. See 91 A. L. R. 2d 496, which points out that such subrogation is generally allowed only where the insured intends that such be the case. Petitioners have not cited and we have not found any Florida statute or cases upholding a beneficiary's right of subrogation against an insured's estate when the policy proceeds were assigned to satisfy the insured's debts. However, it is clear that, *176 under Florida law, an assignee of a policy assigned as collateral obtains broad powers over the policy and its proceeds. As the Supreme Court of Florida stated in Moon v. Williams, 135 So. 555, 557 (1931): The effect of the assignment of a life insurance policy, which assignment is made in accordance with the terms of the policy, is to place the assignee in the same status with respect to all rights and liabilities under it that the insured occupied before the transfer. It may be said to amount to the substitution for the assured of the assignee as a party to the policy. Atlantic Mutual Life Insurance Co. v. Gannon, supra; Bacon's Life and Accident Insurance (4th Ed.), sec. 386, Metropolitan Life Insurance Co. v. O'Brien, 92 Mich. 584, 52 N. W. 1012; Opitz v. Karel, 118 Wis. 527, 95 N. W. 948, 62 L. R. A. 982, 99 Am. St. Rep. 1004. A life insurance policy is a mere chose in action, and, unless some provision of the contract forbids its assignment, it may be assigned as other choses in action. See note 87 Am. St. Rep. 486, and authorities there cited. Bushnell v. Bushnell, 92 Ind. 503; Hutson, Administrator, v. Merrifield, Administrator, 51 Ind. 24, 19 Am. Rep. 722. *177 In Bancroft v. West, 174 So. 327 (1937), the Supreme Court of Florida, without discussing alternative sources of payment of the deceased's debt, held that the assignee of a policy assigned as security had a right to the policy proceeds superior to that of the named beneficiary of the policy. In Travelers Ins. Co. V. Tallahassee Bank and Trust Co., 133 So. 2d 463, 467 (1961), the District Court of Appeals of Florida held that where an assignee is entitled to receive the proceeds of a policy, he is in fact the beneficiary--the policyholder merely enjoying an equity of redemption. Further, where a policy has been assigned as security, the rule in Florida appears to be that the right of subrogation is strictly limited to those cases where the insured himself has such right. Support for this position is found in Ulery v. Asphalt Paving Inc., 119 So. 2d 432, 436 (Fla. Dist. Ct. App. 1960), supplemented 149 So. 2d 370 (1963), where the DDistrict Court of Appeals of Florida was careful to distinguuish the Bancroft case, supra, as one where the policy assigned was to secure a direct obligation of the insured, as opposed to the case *178 before it where the insured had assigned a policy for the benefit of a third party. Cf. also Travelers Ins. Co., supra, where the insurance company was held liable to the assignee of a policy where the insured elected to discontinue the policy and the assignee was not given the opportunity to continue it. In denying the insurance company's claim that it should be subrogated to the claim of the assignee against the insured's estate, the court stated (133 So. 2d at 466-467): We are not here confronted by the orthodox subrogation situation in which one party pays off the debt of another and seeks the right to be placed in the stead of the creditor. Here the debtor-creditor relationship existed directly between the insurance company and the bank, and there is no basis for the application of any aspect of the doctrine of equitable subrogation. Applying the above principles to the instant case, Florida law gave the Bank of the Commonwealth broad powers over the life insurance policies on Gregg's life, reducing his rights over the policies to a mere equity of redemption to the extent of the outstanding loans. Further, the policies were assigned for Gregg's *179 personal obligation, not those of a third party, a circumstance outside the "orthodox subrogation situation." Under such circumstances it appears clear that the bank was effectively substituted for Gregg and that only its desires, not Gregg's or Jessie's determined whether the estate or the respective insurance companies would ultimately be utilized to satisfy the obligation secured by the policies. Therefore, we find those cases in other jurisdictions, which might grant subrogation under circumstances similar to those here, are not applicable in the instant case and hold that under Florida law Jessie had no right to be reimbured for the $38,755.86 insurance proceeds used to satisfy Gregg's obligation to the bank. Consequently, we further find and hold that that amount cannot be considered as property passing to Jessie from Gregg and does not qualify for the marital deduction. Though the above holding affirms respondent's determination that the above proceeds are not a part of the marital deduction we find that respondent has improperly computed that deduction in his statutory notice of deficiency. In computing the residuary estate which passed to Jessie respondent reduced Gregg's *180 gross estate, inter alia, by subtracting the life insurance proceeds, and also by subtracting $155,729.22, as representing the estate's debts to be paid out of the residuary estate. The $155,729.22 amount, however included the $38,755.86 debt of the bank, which amount was already satisfied by the life insurance proceeds and was not a debt to be paid out of the residuary estate. Therefore, the residuary estate should be increased by $38,755.86 in computing the residue passing to Jessie. Decisions will be entered under Rule 50. Footnotes
1. The stipulation recites that Hugh died intestate and left a will. Since intestacy necessarily excludes the existence of a will, we have interpreted the stipulation to mean that Hugh died testate.↩
*. This amount is the amount stipulated to by the parties. The assets actually total $2,120,901.30. The $700 difference is unexplained.↩
2. SEC. 2031. DEFINITION OF GROSS ESTATE. (a) General. - The value of the gross estate of the decedent shall be determined by including * * * the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated. SEC. 2032. ALTERNATIVE VALUATION. (a) General. - The value of the gross estate may be determined, if the executor so elects, by valuing all the property included in the gross estate as follows: * * * (2) In the case of property not distributed, sold, exchanged, or otherwise disposed of, within 1 year after the decedent's death such property shall be valued as of the date 1 year after the decedent's death. References to the Internal Revenue Code are to the Code of 1954.↩
3. These figures are stipulated. On briefs, however, petitioners have disclosed (and respondent has agreed) that mathematical errors were made and that actual policy proceeds were $80.76 less than stipulated so that the amount conceded by respondent as qualifying for the marital deduction is $1,776.85.↩
4. SEC. "2056. BEQUESTS, ETC., TO SURVIVING SPOUSE. (a) Allowance of Marital Deduction.--For purposes of the tax imposed by section 2001↩, the value of the taxable estate shall, except as limited by subsections (b), (c), and (d), be determined by deducting from the value of the gross estate an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate.