ESTATE OF BERTHA B. MOSHER, DECEASED, JAY M. MOSHER, JR., AND ARLENE M. SIEMERS, CO-EXECUTORS, Petitioner v. Commissioner of Internal Revenue, Respondent
Estate of Mosher v. Commissioner
Docket No. 18238-84.
United States Tax Court
T.C. Memo 1988-24; 1988 Tax Ct. Memo LEXIS 22; 54 T.C.M. (CCH) 1578; T.C.M. (RIA) 88024; January 21, 1988; As amended March 17, 1988 Thomas R. Beirne, for the petitioner. Arthur J. Gonzalez, and Raymond Canals for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency of $ 49,722 in the Federal estate tax of the Estate of Bertha B. Mosher. By amended answer, dated September 5, 1984, respondent increased the deficiency to $ 55,369.26. After concessions, the issues for decision are the date of death values of properties and stock in a closely-held corporation held by decedent. For convenience, we have combined *23 the findings of fact with the opinion. Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by reference. Petitioner is the Estate of Bertha B. Mosher, ("petitioner" or "estate") who was a resident of Westchester, New York when she died on November 5, 1980 ("date of death"). Jay M. Mosher, Jr. and Arlene M. Siemers are the co-executors of her Estate ("executors"). Jay M. Mosher, Jr. resided in Katonah, New York, and Arlene M. Siemers resided in White Plains, New York when the petition was filed. Petitioner's Federal estate tax return was timely filed by the executors on July 29, 1981. By letter dated July 26, 1983, the executors amended the values reported on the original return enclosing expert appraisals. An amended Federal estate tax return was filed on May 10, 1984 ("amended return") which incorporated the amended values as set forth in the July 26, 1983 letter. In his notice of deficiency, respondent determined increases to the values reported on the original return. The list below summarizes the date of death values: Value reported
Value reported
Value shown
on original
on amended
on notice of
return
return
deficiency
130 Westchester
$ 233,000
$ 97,000
Avenue
less (40,674)
less (40,674)
$ 233,000
mortgage
mortgage
$ 192,326
$ 56,326
Primrose Street
Lot 22C
$ 144,500
$ 125,000
$ 152,543
Lot 22E
126,500
116,000
167,457
$ 271,000
$ 241,000
$ 320,000
50 shares of Mosher
Corporation Stock
Frito-Lay
$ 74,752
$ 63,000 with
$ 105,000
(50% interest)
10% discount
Federal
$ 47,174
$ 43,425 with
$ 75,500
Building
10% discount
(50% interest)
*24 Petr's Expert
Crawford's
Resp's
Crawford
amended
Expert
original
appraisal
Ferrarone's
appraisal
5/19/83
appraisal
6/1/81
& 4/20/83
11/26/85
130 Westchester
$ 233,000
$ 97,000
$ 192,000
Avenue
Primrose Street
Lot 22C
$ 144,500
$ 125,000
$ 160,000
Lot 22E
126,500
116,000
140,000
$ 271,000
$ 241,000
$ 300,000
50 shares of Mosher
Corporation Stock
Frito-Lay
$ 83,058
$ 70,000
$ 86,000
(50% interest)
(without
(without
discount)
discount)
Federal
$ 53,857
$ 48,250
$ 63,000
Building
(without
(without
(50% interest)
discount)
discount)
The properties were included in the gross estate of Jay M. Mosher, decedent's late husband who died November 17, 1979. Petitioner's appraisals were prepared by Reginald E. Crawford, M.A.I. of Albert Appraisal Company, Inc. ("Crawford"). Crawford is a real estate appraiser and a duly licensed real estate salesman in the State of New York. He has been engaged since 1929 as an estimator and coordinator for real estate development companies and as a salesman of real estate in Westchester County. He was personally familiar with the real estate of *25 Jay M. Mosher and decedent. Crawford's appraisal was prepared on June 1, 1981, and updated on April 20 and May 19, 1983. Respondent's appraisals were prepared by Edward J. Ferrarone, M.A.I. ("Ferrarone"), of Lane Appraisals, Inc., in Westchester County on November 26, 1985. Ferrarone is a licensed real estate salesman and a real estate law instructor for the New York Department of State. He has a bachelor of arts and a master's degree in Business Administration from Boston College. His list of appraisal experience for financial institutions and for nationally known institutions is long.
Section 2031(a)[1] provides that "The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Section 20.2031-1(b), *26 Estate Tax Regs. Estate of Bright v. United States,658 F.2d 999, 1005 (5th Cir. 1981); Gresham v. Commissioner,79 T.C. 322, 326 (1982), affd. 752 F.2d 518 (10th Cir. 1985). We must look to all the relevant facts and testimony and the record as a whole to make our determination. See Hamm v. Commissioner,325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. The relevant facts are those that a hypothetical buyer and seller could reasonably have been expected to know as of the date of death. See First National Bank of Kenosha v. United States,763 F.2d 891 (7th Cir. 1985). Valuation of property is often capable of resolution by the courts only through "Solomon-like pronouncements." Symington v. Commissioner,87 T.C. 892, 904 (1986); *27 Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980). "The Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise * * *." Buffalo Tool & Die Mfg. Co. v. Commissioner, supra at 452. Moreover, in deciding if one or the other party is more convincing, we need not accept either party's expert testimony concerning value entirely, in part or at all. See Palmer v. Commissioner,523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974). With this background, we will examine individually each of the estate's properties, the values of which are in controversy. 1. 130 Westchester Avenue
The property known as 130 Westchester Avenue was purchased by decedent's late husband in 1977 for $ 299,628. It is located in White Plains, New York, Westchester County, approximately 23 miles north of midtown New York City. The property is situated on the edge of a primary retail area on a major thoroughfare. *28 Tenants within close distance include the retail chains of Neiman-Marcus and B. Altman. The property consisted of a steel frame and stucco building with a partial ground floor and full second floor. It had been used as a drive-in bank building by the National Bank of Westchester ("NBW") under a lease that expired on April 1, 1980, with a 1-year renewal option to April 1, 1981. Since then, the ground floor has been fully closed and converted into office space at a cost of approximately $ 75,000. Topographically, the parcel is level, at street grade, and provides parking for 13 automobiles and 2 loading spaces. The land contains 14,348 square feet, and the building had approximately 3,155 square feet of gross rentable area. On the original return, the estate listed the date of death fair market value as $ 233,000 based on Crawford's first appraisal dated June 1, 1981. On the amended return, the value was reduced to $ 97,000 based on Crawford's 1983 updated appraisal. Respondent determined that the date of death fair market value was $ 233,000 in his notice of deficiency. Respondent's expert, Ferrarone, valued the property at $ 192,000.
a. Petitioner's appraisal
*29 This property was first inspected by Crawford on January 31, 1980, for the purpose of valuing it as of the date of death of decedent's late husband, November 17, 1979. The highest and best use of the property was listed as "banking office with parking." The building was 15 years old as of November 17, 1979, with a remaining "economic and useful life" estimated at 30 years. The vacant land value was listed as $ 158,000. The overall property was appraised at $ 329,000 [2] as of November 17, 1979. Crawford used a capitalization rate of 11.5 percent. Crawford prepared an appraisal of the property for decedent's husband's estate as of the alternate valuation date, May 17, 1980, and valued it at $ 302,400. This lowering of value was based on the fact that the interest and discount rates had risen as much as 5 points, so that a reasonable return would be 12.5 percent. *30 On June 1, 1981, Crawford's original appraisal for the Bertha B. Mosher Estate listed the highest and best use of this property as a "banking office with parking" and noted that "the property had been vacated by NBW and that discussions with local brokers led him to the conclusion that no market existed for the building for use as a bank and that its probable best use in the future was as an office for a single tenant." He also noted that the property had been offered for lease since the bank moved out on April 1, 1981, but because the first floor was no longer usable without extensive renovation it was of less value to a prospective tenant. Crawford estimated that a reasonable per square foot net rental would be $ 12 based on a comparison of current rentals and offerings for office space in the vicinity and calculated the annual rent as follows: 3,155 square feet at $ 12 = $ 38,000. Based on the foregoing and using an Income Approach, the fair market value was estimated to be $ 233,000: Estimated Gross Annual Income
$ 38,000
Vacancy & Credit Loss Allowance at 5%
1,900
Effective Gross Annual Income
$ 36,100
Expenses
Taxes
Tenant
Insurance
Tenant
Repairs & Replacement
$   750
Management & Commission
1,805
Total Expenses
$  2,555
Estimated Net Income Before Depreciation/Recapture
$ 33,545
Capitalization
Band of Investment Rate
70% Mortgage at 15% =
10.50
30% Equity   at 13% =
3.90
Interest Rate
14.40
*31 Net Income $ 33,545 divided by 14.40 = $ 232,951 On May 19, 1983, Crawford updated his appraisal of 130 Westchester Avenue as of decedent's date of death based on what petitioner contends was additional information Crawford received concerning conditions that existed on the date of death, but not considered in the original appraisal. In his May 19, 1983 update, Crawford determined that the highest and best use for the property on the date of death was for "office space." He again noted the need for substantial alterations to the ground floor. Moreover, it was concluded that as of the date of death, the property could not be rented as a bank without obtaining a zoning variance. Crawford noted the following facts as a basis for his downward adjustment to $ 97,000 (from $ 233,000): 1) it could no longer be used as a bank; 2) the traffic regulations had been changed so that no one coming from White Plains could make a left turn into the property (one reason why the NBW decided to move); 3) a large portion of the upstairs space was taken up with the staircase and the vault enclosure; 4) the isolation of the downstairs space 5) the lack of parking on the property, and; 6) the change *32 of city parking regulations which required twice as much space. Crawford also commented that a conversion of the ground floor took place after a fruitless effort to rent the property. Crawford estimated gross annual income based on a value of $ 10.15 per square foot. He determined this value based on the following set of factors. Since the conversion, the property had been rented to a new computer business for a rent of $ 12.69 per square foot with the landlord paying for taxes, repairs and insurance. As of the date of the original appraisal, rental values had increased 10 percent per year so that the 1983 rent of $ 12.69 was worth only $ 10.15 at the date of the updated appraisal. Thus, Crawford used that amount to estimate gross annual income and, hence, fair market value as of decedent's date of death. Based on the foregoing, Crawford determined that the present value of the future benefits that might accrue to the property assuming it could be rented were as follows: Estimated Gross Annual Income     3,155 square feet at $ 10.15
$ 32,000
Vacancy & Credit Loss Allowance at 10%
3,200
Effective Gross Annual Income
$ 28,800
Expenses
Real Estate Taxes
$11,256
Insurance
500
Repairs
500
Commission 5%
1,600
Management 3%
960
Total Expenses
$ 14,816
Estimated Net Income Before Depreciation/
Recapture
$ 13,984
Capitalization
Band of Investment Rate
70% Mortgage at 15% =
10.50
30% Equity at 13% =
3.90
Interest Rate
14.40
*33 Net Income $ 17,440 divided by 14.40 =
$ 97,111
Rounded
$ 97,000
The gross rentable area after renovation was 4,730 square feet. At trial, Crawford admitted that the rental per square foot he used was the rental rate received by 130 Westchester Avenue after it was renovated, and further that the discounted rent from 1983 was essentially based upon a "different building." Crawford used comparable leases to establish rental per square foot in all of his reports except his final report.
b. Respondent's appraisal
Ferrarone, respondent's expert, also determined that the highest and best use of the property as of the date of death was as a banking office. Ferrarone concluded, however, that the property was rentable as office space on the date of death without further renovation. He noted that the Bank of New York had a banking office one block away from the property and that the buildings in this location were a mix of office and retail. Moreover, despite any future changes to the contrary, the zoning as it existed on the date of death permitted banking offices. Based on an analysis of recent leases of a similar type in nearby White Plains, Ferrarone *34 concluded that the fair rental value of the property would have been $ 12.50 per square foot for 3,154 square feet or $ 39,425 per annum. Ferrarone determined that the land value of the 14,348 site was $ 12 per squre foot or approximately $ 170,000. To determine this, he relied on comparable sales, comprised of three plots of vacant land located in White Plains. This value took into account demolition costs. He determined that the overall fair market value was $ 192,000 based upon an "Income Approach" using an overall capitalization rate of 13.80 percent. He used an 11 percent equity dividend rate in his figure because he noted that knowledgeable local investors "are currently seeking returns of from 10 percent to 13 percent for this type of investment." He used the following date to arrive at this conclusion: STATEMENT OF ESTIMATED INCOME AND EXPENSES
ESTIMATED GROSS INCOME:
3,154 square feet at $ 13.00
$ 41,002.00
LESS: 2-1/2% Vacancy/Credit Loss
-1,025.00
EFFECTIVE GROSS INCOME:
$ 39,977.00
ESTIMATED EXPENSES:
Real Estate Taxes
$ 11,238.00
Insurance
500.00
Structural Repairs
500.00
Management at 3%
1,199.00
TOTAL ESTIMATED EXPENSES:
$ 13,437.00
NET OPERATING INCOME:
$ 26,540.00
*35 BAND OF INVESTMENT
Mortgage
70%  X  15.00%  =
10.50%
Equity
30%  X  11.00%  =
3.30%
Overall Capitalization Rate
13.80%
CAPITALIZATION OF NET INCOME:
The net income of $ 26,540.00 is capitalized at 13.80%, indicating a value of $ 192,318.00, rounded to $ 192,000.00. Ferrarone found that the neighborhood in 1985 was almost identical to how it was in 1980 and 1981, and that the vacancy rate in the area is very low.
c. Fair Market Value of 130 Westchester Avenue
We find several flaws in petitioner's appraisal. Foremost, Crawford had already considered most of his allegedly "new considerations" in his original appraisal of June 1, 1981, where he valued the property at $ 233,000. First, in Crawford's original appraisal, he identified the property as a "former bank building," signifying a shift in his previous approach to valuing the property, and concluded that the highest and best use in the future was for offices for a single tenant. He further noted that the lower level was of less value to a prospective tenant. Based primarily on this information, he concluded that the fair market value of the building was $ 233,000. [3]
*36 In his May 19, 1983, update, Crawford also determined that the highest and best use of the property was for offices. Additionally, zoning, traffic regulations and parking problems were factored into the value. Coupled with the conversion of the building, Crawford determined a fair market value of $ 97,000. We find the value determined by the updated appraisal unsupported by the record as a whole. First, the highest and best use of the building in both 1981 and 1983 was determined to be "office" use. As of the earlier report, Crawford found that Mr. Mosher, one of the executors, had been unsuccessful in leasing the property. Yet a 5 percent vacancy allowance was used in the original appraisal whereas a 10 percent vacancy allowance was used in the updated appraisal. The latter increase was allegedly based on a "new" consideration, i.e., Mr. Mosher's failure to lease the property, a fact previously considered. Crawford ignored the obvious reason for Mr. Mosher's failure. He continued to market the building as a bank when its declining marketability as a bank had already been established. Also in the update report Crawford decided to reduce the annual net income by a one-time *37 commission expense, which he did not allocate over the life of the lease. Second, Crawford, in his updated appraisal of the property, established rental value per square foot by discounting the rent received on the building as renovated some 3 years after the date of death but admits that the building as renovated was essentially a "different building." In all Crawford's other estimates of rental value per square foot, he used comparable leases to establish its value. Ferrarone used comparable leases to establish his determination that the fair rental value per square foot was $ 13. The $ 13 amount was also used to compute the net operating figure used in later computations. It is more reasonable to use comparable leases to establish the rental value than to base one's appraisal on rentals 3 years from the date of death after the conversion of the building. Third, the value of the vacant land as of the date of death, according to Ferrarone, was about $ 170,000. The comparables he used took the cost of demolition into account. Crawford, as of November 1979, estimated the vacant land was worth $ 158,000, almost $ 60,000 more than the fair market value of the property adopted *38 in his 1983 updated appraisal. Crawford also took the cost of demolition into account. If we used Crawford's 10 percent rate of appreciation due to "inflation" and "supply and demand for land," the land value would clearly be of greater value than it was in 1979. The value of the property with a rentable building thereon would logically exceed the value of land alone. Petitioner contends, however, that in valuing the property, Ferrarone failed to consider that the property was incorporated into a family business at the date of death and that the change in zoning regulations affected its marketability. Nowhere in Crawford's appraisals was there mention of the family business as a factor in his determination of value. The zoning changes took place more than 5 months after the date of death and should not be considered for purposes of valuation unless known at the time. See First National Bank of Kenosha v. United States,763 F.2d 891 (7th Cir. 1985). Petitioner knew of these "changes" as early as the date of death, and Crawford determined the highest and best value was as an "office" even before the "new" changes took effect. While petitioner argues that the *39 publicity generated by the discussions of a zoning change affected the value, and that prior to the date of death it was publicly known that a zoning change in White Plains would depreciate the property's value, we have no evidence other than petitioner's statement in its reply brief that this was in fact so. No comparable rentals of other properties affected by the change in zoning were offered as proof of such a decline in value. Finally, as respondent points out, there is no evidence to establish that the change in zoning prohibited its use as office space, the highest and best use determined by both Crawford and Ferrarone. Petitioner also argues that the property's need for extensive improvement required substantial time and cost before the property could be marketable, and therefore that the property is atypical when compared to the general market. They cite Estate of Butscher v. Commissioner,T.C. Memo 1975-225, as support for their conclusion that Ferrarone's appraisal failed to consider the cost of conversion in his valuation; and that the appraisal is therefore overvalued. In the Butscher case, the property was being used as a bowling alley and *40 this was determined to be its "highest and best use." However, the projected "highest and best use" at the end of the primary term of the lease was that of commercial retail building, a fact known at the date of death. Due to this projected change in use, a method was chosen by both parties to reflect this conversion at the end of the bowling alley lease. This is not the situation here. Both parties have agreed that as of the date of death, the highest and best use of the property located at 130 Westchester would be for office space, and there was no reason to believe it would change. The appraiser did not and should not have considered the cost of renovation. Based on the foregoing, we conclude that Ferrarone's analysis and appraisal is the more reasonable and arrives at more nearly the correct result. We say more nearly the correct result because we decline to adopt Ferrarone's equity rate of 11 percent used in his Band of Investment calculations. Ferrarone states in his report that "knowledgeable local investors are currently seeking returns of from 10 percent to 13 percent for this type of investment," and adopts an 11 percent equity rate for the appraisal. While it is possible *41 he was referring to the applicable rate of return as of decedent's date of death and not as of 1985, the year of his appraisal, nothing in the record specifically supports this conclusion. We are more persuaded by the fact that at the time of decedent's death, investments in corporate bonds rated Aaa were yielding 12.97 percent, United States 10-year bonds were yielding 12.34 percent, and the prime rate was 16.06 percent. Clearly, an investment in real estate should yield a higher rate of return to reflect the 'risk' inherent in such an investment. We therefore adopt petitioner's equity rate of 13 percent for a capitalization rate of 14.40 percent. The fair market value of 130 Westchester Avenue on November 5, 1980, was $ 184,305, rounded to $ 184,000. 2. Primrose Street Property
The Primrose Street properties are two residential dwellings known as Lot 22C and Lot 22E, located in the Town of Somers, New York. Somers is primarily a residential community, situated in Westchester County, an increasingly populated area due to the expansion of the New York Metropolitan area. The character of the neighborhood is 95 percent residential and 5 percent commercial, with a rising *42 economic trend. Schools are within one mile. The population in the town in the 1970-1980 decade had increased 39.7 percent, the largest increase of any municipality in Westchester County, and this reflects strong demands for homes in this area. The total number of housing units increased in the same decade by 53.3 percent. Respondent determined in the notice of deficiency that the combined values of these properties was $ 320,000 as of the date of decedent's death. Ferrarone determined that the combined valued was $ 300,000 (Lot 22C -- $ 160,000; Lot 22E -- $ 140,000). Petitioner in its original return showed a combined value of $ 271,000 (Lot 22C -- $ 144,500; Lot 22E -- $ 126,500). In its amended return, petitioner reduced the value to $ 241,000 (Lot 22C -- $ 125,000; Lot 22E -- $ 116,000). In determining the fair market values of the properties, both experts used the market data approach and comparable number one "Lot 22A-17A" was accorded the greatest weight. Both appraisers used the same configuration of the properties in their appraisal.
a. Petitioner's appraisal
Lot 22C was first inspected for the purpose of an appraisal for the Estate of Jay M. Mosher and *43 described as a 2,055 square foot one-family dwelling on 5.627 acres. Structural improvements on the subject property as of the date of death consisted of a single-family residence, a cottage and attached garage and a detached four car garage. The main house was described as having three bathrooms, three bedrooms, a den, a sewing room, a living and dining room, and a kitchen. The guest cottage had two rooms, one bath and one car garage. The cottage living area is 900 square feet. The house was 33 years old at the date of death. The buildings were determined to be in good, marketable condition. The remaining economic and useful life was estimated to be 40 years. The property had a 20-by-40 foot concrete swimming pool on site. The property was determined to have a value in the Estate of Jay M. Mosher of $ 137,700. On June 30, 1980, Crawford reappraised market value as of May 17, 1980, the alternative valuation date, for the Estate of Jay M. Mosher and determined that the value was still $ 137,700. On June 1, 1981, Crawford prepared a report for decedent's estate as of the date of death and stated that all of the underlying assumptions and contingent conditions remained the *44 same. He continued, however, that the "two properties (referring to Lot 22E as well) are located next to a very large condominium project called Primrose Farms," which was unfinished, run down and had entered into bankruptcy proceedings. He also estimated that the general increase in the surrounding properties has been at a rate of approximately 5 percent per year in the past 2 years. In general, the subject property remained the same. Based on this analysis, the property was determined to have a value of $ 144,500, an increase in value of over $ 6,000 from a year earlier. On his updated appraisal for the estate of decedent, Crawford noted that the following negative factors caused him to change the value of Lot 22C, as compared to his first appraisal for the estate of $ 144,500 to $ 125,000: (a) Condition of Primrose Farm. (b) Proximity of Lincoln Hall, a large established school for delinquent boys. (c) Murder of a woman who lived next door to the lots by two of the inmates from the school. (d) Set back of the property on the plot, requiring 800 feet of driveway and extra expense for maintenance. (e) Lot 22C only had enough frontage for one parcel. Lot 22E *45 was first appraised for the Estate of Jay M. Mosher as of November 7, 1979. The property was described as a one family, residential dwelling on 6.883 acres. It was 7 years old on the date of the first appraisal and determined to be in good, marketable condition. The first floor was described as having a living and dining room, kitchen, office, den, laundry space, two bathrooms, two bedrooms and an unfinished attic. It also had a two car heated garage with electric doors and a full utility basement. It was determined to have an economic and useful life of 50 years. On-site improvements were described as a blacktop driveway, shrubs and lawns. Using a market data approach, the property was determined to have a value in the Estate of Jay M. Mosher of $ 120,500. On June 30, 1980, Crawford prepared an appraisal as of the alternative valuation date, May 17, 1980, and found the value of the lot was still $ 120,500. On June 1, 1981, Crawford appraised the property for the purpose of estimating its market value as of November 5, 1980, the date of death of decedent. Once again, Crawford noted the existence of the bankrupt Primrose Farms and an increase in the value of the surrounding *46 properties at 5 percent per year in the past 2 years. He determined the fair market value to be $ 126,500, relying on all the underlying assumptions and conditions of the earlier reports. On his updated appraisal of the property for the estate, Crawford commented on all of the negative changes previously discussed as to Lot 22C, and additionally noted that: (a) The house on Parcel 22E shown in the previous report to have 2,540 square feet of living area but that the correct living area was 1,795 square feet. (b) Lot 22E had sufficient frontage for another building parcel but that a neighbor's septic tank was on the excess land which would reduce its value. Based on these factors and the previously maintained factors, Crawford re-estimated the value of Lot 22E at $ 116,000, using a "comparison" value method.
b. Respondent's appraisal
Lot 22C was described as a lot containing 5.947 acres with access via a long driveway extending over adjoining properties which provides good access to the house. For purposes of his analysis, Ferrarone adopted the acreage which reflected a subdivision between Lot 22C and Lot 22E occurring after decedent's date of death. He concluded, *47 however, "because each lot was in the same ownership, the actual boundary lines were unimportant." Ferrarone further noted that the site in the area of the house enjoys good views of the countryside, and that the house is set well back from the street, enjoys excellent privacy and is not visible from the road. The house itself is described as a one-and one-half story L-shaped single-family residence, plus an attached garage. The walls have aluminum siding. It has a partially finished basement. The interior is described as a living and dining room, kitchen with four bedrooms, a maid's bedroom, and two bathrooms. A portion of the house is used as an office. The building was found to include a total of 2,891 square feet, 616 square feet in the office section excluding the garage and 2,275 square feet in the balance of the house. There was a concrete pool on the property. The buildings were constructed in 1952 and were in good condition. TTo arrive at his fair market value, Ferrarone relied on the sales of comparable property in the Town of Somers. After adjusting the various items of comparison, he determined that the fair market value was $ 160,000 as of the date of death.
*48 Lot 22E was described as a single family residence with an attached two car garage, and an attached greenhouse at the rear of the building with 90 square feet and an opened but covered rear porch. Ferrarone could not inspect the interior of the building as it had been sold since the effective date of the appraisal, but Mr. Jay M. Mosher, Jr. assured Ferrarone that the interior was as described in the appraisal by Crawford and Ferrarone relied on these facts. Ferrarone used a comparable sales approach to determine a fair market value of $ 140,000 for Lot 22E.
c. Fair Market Value of Lot 22C and Lot 22E
Both Ferrarone's and Crawford's reports considered at least three comparable sales. Lot 22A-17A was given the greatest weight. We will accord it the same status. The experts agreed that Primrose Street, Lot 22A-17A, was most alike Lot 22C and Lot 22E as it is located on the same street as the subject properties on an adjoining lot and had comparable improvements. Lot 22A-17A sold for $ 129,000 shortly before the date of death, but after the murder. Lot 22A-17A is a one story ranch style house containing eight rooms, four bedrooms, four baths, and 2,072 square feet of *49 living area. The property sits on 3.9 acres. It has a two car garage, a cabana and a pool. With this in mind, we will review the relevant information regarding Lot 22A-17A as representative of all the comparables and closest to the subject properties. Lot 22C
Crawford determined Lot 22C had a value of $ 125,000 compared to 22A-17A because 1) it had a longer driveway requiring greater maintenance; 2) smaller frontage; 3) Primrose Farms abuts the property; 4) the murder was across the street from Lot 22C. Ferrarone determined Lot 22C had a value of $ 160,000 by comparison because the Lot 22C house 1) is newer; 2) has approximately 1.5 more acres of land; and 3) has more gross living area. We find Ferrarone's appraisal is more reasonable after reviewing the record as a whole, with particular emphasis on the Lot 22A-17A comparison. Initially, we must point out that we do not give great weight to either the presence of Primrose Farms or the murder. The murder appeared to have no effect on the sale of comparable Lot 22A-17A. The listing price before the murder was $ 129,900 and it sold after the murder for $ 129,000, a $ 900 difference. Petitioner argues through some *50 detailed calculation that the murder had a 3.1 percent detrimental influence. We cannot adopt such a far out analysis. As for the Primrose Farms, we also discount this factor in our analysis. While it may have been a "blight" as petitioner suggests, we can only guess as to its influence on the other comparables. We are also influenced by the fact that Crawford himself increased the value of Lot 22C from $ 137,700 to $ 144,500 from 1980 to 1981 despite the presence of Primrose Farms, a factor he considered in each of his appraisals for decedent's estate. Moreover, the town has had a rapid population and economic growth over the last decade, a factor which would increase the property values, not decrease them. We question why Crawford did not continue to increase the value of the lots by 5 percent in appraisals subsequent to the original appraisal for the estate of the decedent. We adopt Ferrarone's value of $ 160,000. Lot 22E
Crawford and Ferrarone each compared Lot 22E to Lot 22A-17A in much the same manner as set forth above for Lot 22C, with one notable exception, i.e., the age of the house located thereon. The home on Lot 22E was 43 years newer than the house *51 on Lot 22A-17A. We conclude that Ferrarone's upward adjustment to $ 140,000 is more logical than Crawford's downward adjustment to $ 116,000. 3. Warehouse Lane Property
The property is situated on the southerly side of Warehouse Lane, approximately 392 feet west of Saw Mill River Road in the Town of Greenburgh. The property contains two distribution warehouses known as the "Frito-Lay" and the "Federal" buildings. The subject properties are jointly owned by Mosher Construction Company and the National Tree Company. Each owns a one-half interest. Decedent owned 100 percent of the stock of the Mosher Construction Company when she died. On the original estate tax return, petitioner claimed the value of its interest in the Frito-Lay Property at $ 74,752 and the value of its interest in the Federal building at $ 47,174. On the amended returns, these values were reduced to $ 63,000 and $ 43,425 respectively. The values reported on the original and amended returns reflect a claimed 10 percent discount. Respondent determined that petitioner's half interests in the Frito-Lay and Federal buildings were valued at $ 105,500 and $ 75,000 based on fair market values of $ 211,000 *52 and $ 151,000. Ferrarone determined that the values of petitioner's interests were $ 86,000 and $ 63,000, respectively, as of decedent's date of death. Both experts determined that the highest and best use for the buildings was as distribution warehouses.
a. Frito-Lay building
1. Petitioner's appraisal
The property was first inspected by Crawford for the purpose of an appraisal for the Estate of Jay M. Mosher, decedent's late husband, on April 14, 1980. The building was 5 years old as of the date of death, and Crawford estimated that the building had a economic and useful life of 30 years. The building had 7,500 square feet rental space and was under a lease for 5 years. Crawford stated that there was a history of seasonal flooding causing a two to three feet depth of water over the entire property. Crawford determined the property had a value of $ 164,000 as of the date of death of Jay M. Mosher. Decedent's 50-percent interest was valued at $ 73,800 (one-half market value at $ 82,000 (less) a 10 percent discount of $ 8,200 attributed to management responsibilities.) [4] Crawford used the "building residual method" of valuation because the insubstantial quality *53 of the building called for a higher capitalization rate. The capitalization he used was 16.30 percent. On June 30, 1980, Crawford prepared a second report for the Estate of Jay M. Mosher for the purpose of re-estimating the value of the property as of May 17, 1980, the alternative valuation date. He revised his calculations based on his determination that the interest rate had risen as much as 5 percent, and estimated the fair market value of Mosher Corporation's interest to be $ 69,750 based on a 14 percent interest return. He concluded all other conditions remained the same. On June 1, 1981, Crawford prepared the appraisal of the Frito-Lay building for the Estate of Bertha B. Mosher and stated that all of the underlying assumptions and contingent conditions named in the former reports remained the same. The property was still under lease to Frito-Lay, a lease *54 which was set to expire on July 31, 1984, but had two 5-year options taking it to July 31, 1994. He noted that "there is every reason to believe that the options will be exercised and that the property will remain encumbered for 13 years and 8 months." The average rental of the options of $ 28,476 per year was estimated to be something less than economic rent. Based on the factors listed, the total market value was determined to be $ 166,116. Crawford valued petitioner's 50 percent interest at $ 74,750, which included a 10 percent discount. Finally, on May 19, 1983, Crawford updated the appraisal of the Frito-Lay Building based on information he received concerning conditions previously not considered that affected the property and that existed on the date of death. These "new" conditions included -- 1) the property was located within a "flood plain" as shown on maps of the New York State Environmental Agency; 2) the property had no frontage on a public street; 3) the two properties could not be sold separately; 4) the lease expires on July 31, 1984, but that there is no guarantee that the tenant Frito-Lay will exercise the options to renew the lease; and 5) the interest and capitalization *55 rates affecting the subject property must reflect the fact that real estate is a greater risk than bonds, and in November 1980, safe investments in Aaa corporate bonds were yielding 12.97 percent and U.S. bonds 23.34 percent. Based on the following, the value of petitioner's interest was determined to be $ 63,000, including the 10 percent discount. Estimated Gross Annual Income
$  24,000
Vacancy & Loss Allowance
0
$  24,000
Effective Gross Annual Income
Expenses
Real Estate Taxes
Tenant
Insurance
Tenant
Repairs (reserve)
$ 500
Management 1%
240
Total Expense
$     740
Estimated Net Income Before Depreciation/
Recapture
$  23,260
Interest Rate Derivation
Base (Safe) Rate
12.34%
Risk Rate
2.00%
Non-liquidity
1.00%
Management
.50%
Indicated Interest Rate
15.84%
Estimated Net Income
$  23,260
Income Attributable to Land Value
of $ 107,000 at 15.84%
16,949
Income Attributable to Improvements
$   6,311
Capitalization
Return to Improvements
15.84%
Recapture 30 years
3.30%
Capitalization Rate
19.14%
$ 6,311 divided by 19.14%
= Value of Improvments
$  32,973
Value of Land
$ 107,000
Estimated Value of Property
$ 140,000
Rounded
*56 2. Respondent's appraisal
Respondent noted that the property was located at the entrance to a large distribution center and is in close proximity to major highways. The tenants surrounding the subject area include nationally and internationally-owned tenants. The building is a one-story warehouse which has structural steel framing and trusses, with an aluminum exterior wall. Ferrarone assumed that the 10-year option would most likely be exercised and that any potential purchaser would buy the property subject to the existing tenancy and be bound by the rental schedule. He therefore used the existing rental in calculations. Ferrarone concluded that the joint ownership would have no effect on the value of the one-half interest. He also was of the opinion that the lack of frontage to a public road had no bearing on the value of the parcel because vehicles had been using the paved roadway since the building was constructed. He did not consider the flooding to be so severe as to reduce materially the value of the property. He did, however, reduce the value of comparable rentals by 5 percent to allow for the flood conditions. Finally, Ferrarone believed the buildings were *57 marketable as a pair and that, if not, it would not be difficult to obtain a variance in order to market the buildings separately. Based on the foregoing and the following, Ferrarone determined that the Frito-Lay property had a value of $ 172,000, and valued petitioner's half-interest at $ 86,000. STATEMENT OF ESTIMATED INCOME AND EXPENSES
ANNUAL GROSS INCOME:
7,500 square feet at $ 3.20
$ 24,000.00
LESS: Vacancy/Credit Loss (0%)
0
ACTUAL GROSS INCOME
$ 24,000.00
ESTIMATED EXPENSES:
Real Estate Taxes
Tenant
Insurance
Tenant
Structural Repairs
$ 500
Management
250
TOTAL ESTIMATED EXPENSES:
$    750.00
NET OPERATING INCOME:
$ 23,250.00
BAND OF INVESTMENT
Mortgage
70%  X  15%  =
10.50%
Equity
30%  X  10%  =
3.00%
Overall Capitalization Rate
13.50%
CAPTITALIZATION OF NET INCOME:
The net income of $ 23,250.00 is capitalized at 13.50 percent, indicating a value of $ 172,222.00, rounde to $ 172,000.00.
b. Federal building
1. Petitioner's appraisal
This property was first inspected for the purpose of an appraisal for the Estate of Jay M. Mosher, decedent's late *58 husband, on April 14, 1980. The building was 9 years old as of the valuation date and had a remaining economic and useful life of 30 years. The building had 5,000 square feet rental space, and was rented under a lease to expire September 30, 1980. Crawford again noted the history of seasonal flooding of the same nature that affected the Frito-Lay building. As of November 17, 1979, he opined that the building had a value of $ 94,500 (including the 10 percent discount) and decedent's late husband's one-half interest was valued at $ 42,525. Crawford used a capitalization rate of 16.30 percent. On June 30, 1980, the property was re-valued for the Estate of Jay M. Mosher as of the alternative valuation date, May 17, 1980. Crawford considered all of the factors of the earlier report but used a 14 percent interest return rate and valued Mosher Construction's one-half interest at $ 40,000. On June 1, 1981, Crawford prepared a report for the "Federal" building, as of November 5, 1980, decedent's date of death, and stated that all the underlying assumptions and contingent conditions of the earlier appraisals remained the same. He did continue, however, that "Persistent flooding *59 of the site had caused uneasiness in the tenant relationship" and stated it was almost certain the present tenant would not renew its lease. He assumed a rent of no more than $ 3.90 per square foot net-net per year, or $ 19,500, somewhat less than the current $ 24,000 annual rent. Crawford increased the value of the land from $ 48,500 to $ 53,350. Crawford increased the Capitalization Rate from 16.3 percent to 17.3 percent. Based on the foregoing, he determined the fair market value to be $ 107,714 and petitioner's 50 percent interest at $ 48,471, including the 10 percent discount. On May 19, 1983, Crawford prepared an updated appraisal for decedent's estate which reviewed his earlier report estimating market value on November 5, 1980. All underlying assumptions and contingent conditions named in the former report remained the same. As with the Frito-Lay building, "new" conditions relied upon included -- 1) flooding; 2) lack of frontage on a public street; 3) the properties had to be sold as one "parcel;" 4) yields of Aaa corporate bonds and U.S. 10-year bonds and adjustments based on these facts; and, additionally 5) a weak tenancy. Based on the following appraisal and using *60 the "building residual" method, the fair market value was determined to be $ 96,500 and petitioner's interest, $ 43,425, including the 10 percent discount. Estimated Gross Annual Income
$ 19,500    Vacancy & Loss Allowance at 10%
1,950
Effective Gross Annual Income
$ 17,550
Expenses
Real Estate Taxes
Tenant
Insurance
Tenant
Repairs (reserve)
$  500
Management 1%
176
Total Expenses
676
Estimated Net Income Before
Depreciation/Recapture
$ 16,874
Interest Rate Derivation
Base Safe Rate
12.34%
Risk Rate
2.00%
Non-liquidity
1.00%
Management
.50%
Indicated Interest Rate
15.84%
Estimated Net Income
$ 16,874
Income Attributable to Land Value
of $ 48,500 at 15.84%
7,682
Income Attributable to Improvements
$  9,192
Capitalization
Return to Improvements
15.84%
Recapture 30 Years
3.30%
Capitalization Rate
19.14%
$ 9,192 divided by 19.14%
= Value of Improvements
$ 48,025
Value of Land
48,500
Estimated Value of Property
$ 96,500
Rounded
2. Respondent's *61 appraisal
The building is a one-story steel frame structure, with an aluminum exterior wall. There is adequate on-site parking. The property has the same surrounding tenants as those described in the Frito-Lay appraisal. Once again, Ferrarone noted that the building has frontage on a private right of way, but that the vehicles servicing the subject location have been using the roadway since the building was constructed. Access, he concluded, was not a problem. As with the Frito-Lay building, Ferrarone reduced the value of the comparable rentals by 5 percent for flood conditions. Ferrrarone also stated that there would be no difficulty in obtaining a variance to have the property subdivided, to sell each building separately. Based on the foregoing and following, Ferrarone determined the value of the Federal building to be $ 126,000, and petitioner's interest, $ 63,000: STATEMENT OF ESTIMATED INCOME AND EXPENSES
ACTUAL GROSS INCOME
5,000 square feet at $ 4.50
$ 22,500.00
LESS: 3% Vacancy/Credit Loss
675.00
ACTUAL GROSS INCOME:
$ 21,825.00
ESTIMATED EXPENSES:
Real Estate Taxes
$ 3,250.00
Insurance
Tenant
Structural Repairs
500.00
Management at 3%
650.00
TOTAL ESTIMATED EXPENSES:
$  4,400.00
NET OPERATING INCOME:
$ 17,425.00
*62 BAND OF INVESTMENT
Mortgage
70%  X  15.00%  =
10.50%
Equity
30%  X  11.00%  =
3.30%
Overall Capitalization Rate
13.80%
CAPTITALIZATION OF NET INCOME:
The net income of $ 17,425.00 is capitalized at 13.80 percent, indicating a value of $ 126,268.00, rounde to $ 126,000.00.
c. Fair Market Value of Frito-Lay and Federal Building
Based on a thorough review of the evidence, we find Ferrarone's method of appraisal on the whole provides a more reasonable approximation of the values of the properties and better reflects the traditional method of estimating the fair market value of commercial rental real property. Petitioner's arguments to the contrary are confusing and unpersuasive. We reject Crawford's appraisals for a variety of reasons. First, we find unpersuasive petitioner's argument that this particular investment was more than double the risk of another investment in real estate due to the flood conditions. The property had been leased to Frito-Lay, was subject to a renewal of the lease, and had not been vacated as of the date of death. We have little information on how long the floods lasted or the particular damage done *63 by them. In Ferrarone's appraisal, he did not count this as a downward adjustment because the flood problem had been presumably factored into the rent with Frito-Lay. In spite of this, he reduced the value on the rentals on the comparable leases by 5 percent. Overall, there was a demand for warehouse space in this particular area. We further do not believe that the lack of frontage on a public road adversely affected the value. Ferrarone testified, and we find this testimony credible, that he considered the frontage but did not believe it had a material effect on the valuation of the property. The road was paved and a large number of distributors in the area used it. Moreover, we find credible Ferrarone's use of a zero "vacancy/credit loss." Frito-Lay had been a reliable tenant and it would have been reasonable to assume on the date of death that Frito-Lay would renew its lease. The lease was expired in August 1984. The fact that Frito-Lay ultimately after 1984 remained on a year-to-year lease while waiting for new quarters is a consideration which occurred well after the date of death. We additionally find that Ferrarone's use of a 3 percent vacancy rate for the Federal *64 building is valid because we find credible his assertion that the warehouse market in this area is strong. We reject, however, the equity rates Ferrarone used in his appraisals. Ferrarone states in his report that "knowledgeable investors are currently seeking returns from 9 percent to 11 percent for this type of investment." He then adopts a 10 percent equity return based on the presence of what he considers to be a Aaa tenant, Frito-Lay, as well as the tax benefits and appreciation inherent in any real estate investment. We reject this 10 percent equity rate for two reasons. First, when Ferrarone states investors are "currently" seeking returns of 10 percent, it is unclear whether he is referring to the year 1980 or 1985. Nothing in the record clearly supports either date. Second, investors generally demand a higher rate of return for investments in real estate than for other "safe" investments such as treasury bonds because of the "risk" involved. In the instant case, we will adopt petitioner's 13 percent equity return used by Crawford in his 130 Westchester Avenue appraisal, another commercial rental building, which results in an overall capitalization rate of 14.40 percent. *65 Crawford used 12.34 percent as his base rate because on decedent's date of death safe investments in corporate Aaa bonds were yielding 12.97 percent and United States 10-year bonds were yielding 12.34 percent. Any adjustment beyond that reflects the 'risk' factor of real estate. As stated earlier, however, we reject petitioner's argument as to any increased risk in the instant case due to the seasonal floods. We find the fair market value of the Frito-Lay building to be $ 161,458.33, rounded to $ 161,000. This is based on a capitalization rate of 14.40 percent. We find the value of the Federal building to be $ 121,006.94, rounded to $ 121,000 based on a capitalization rate of 14.40 percent. Petitioner's half interests are accordingly determined to be $ 80,500 and $ 60,500. Having determined the above values, we must next address petitioner's argument that a discount should be applied to its interests to reflect 1) joint ownership and lack of control and 2) the burden of management. We will discuss each of these contentions in turn. Petitioner argues that the fair market value of the properties should be discounted to reflect the fact that a hypothetical buyer would not *66 pay the fair market value due to the lack of controlling interest. See Tishman v. United States,207 F. Supp. 830 (E.D. Va. 1959); Estate of Whitehead v. Commissioner,T.C. Memo. 1974-53. Respondent counters that a discount factor should be applied to account only for a "proven" reduced value that an undivided interest might have if the interest were sold on the open market, citing Estate of Iacono v. Commissioner,T.C. Memo 1980-520; Estate of Claflin v. Commissioner,2 B.T.A. 126 (1925); and Estate of Barclay v. Commissioner,2 B.T.A. 696 (1925). Each of these cases states that whether or not a discount should be applied is a question of fact. The facts here point to a situation where there is one piece of land, two warehouses, two partners and the need for a variance to separate the land the buildings sit on. Additionally, one must account for the fact that any purchaser of a 50 percent interest would want to meet with and approve of a relationship with the National Tree Company, the joint-owner in this case. This combination justifies a 10 percent discount on these pieces of property. *67 Accordingly, the value of the Frito-Lay building is $ 144,900 and the value of the Federal building is $ 108,900, and petitioner's discounted interest, $ 72,450 and $ 54,450, respectively. We find, however, that petitioner is not entitled to any further discount for the burden of management. Crawford concluded in each of his appraisals that Mosher Construction Company was entitled to a discount because it was required to manage the property at its own expense. This, in turn, lessened their interest and entitled them to a 10 percent discount to account for this non-controlling interest. This argument is unpersuasive. Crawford considered the burden of management in each of his reports determining fair market value, and the cost was quite insignificant: $ 176 a year for the Federal building and $ 240 a year for the Frito-Lay building. These amounts are truly small when compared to the amount of discount allocated to them by Crawford. Moreover, Crawford allocated an additional .50 of a percentage point for management responsibility in his interest rate derivation. No additional discount on the fair market value is merited. 4. Saw Mill River Road Property
The parties *68 have stipulated that the fair market value of the property is $ 197,000. For the same reasons as articulated in the previous section 3.c., the Saw Mill River Road property is eligible for a discount of 10 percent because of the difficulties inherent in the joint ownership of property, but is not eligible for a similar discount to reflect the burden of management. The fair market value of the Saw Mill River Road property is $ 177,300, and petitioner's interest, $ 88,650. Value of Stock of Mosher Construction Corporation
Petitioner owns 100 percent of the stock of Mosher Construction Corporation, which owns a 50 percent interest in the Frito-Lay and Federal buildings. These are basically the only assets of the corporation, and the value of the stock is primarily attributable to these properties. Petitioner argues that the properties, which represent the value of its 50 shares, should be discounted by 10 percent to reflect the fact that shares in a non-listed closely-held corporation are less marketable than shares in a public corporation, and cites a long list of cases in support of this position. Respondent contends that the fact that the corporation is closely held *69 is not a proper basis for a discount of its underlying assets or "net asset value," because the mere fact that the properties are held in the corporate form does not merit an additional discount or distract from the fact that petitioner owns 100 percent of the stock. See Rev. Rul 59-60, 1959-1 C.B. 237, for the foundation of respondent's contention. We agree. We have already applied a 10 percent discount to the value of these buildings to reflect the burden of joint-ownership. This discount lowered the value of the properties, and thus the net asset value of the corporation. This, in turn, lowered the value of the stock of the closely-held corporation. If petitioner were to sell the properties, the difficulty in finding a purchaser would stem from the joint ownership and not from the fact that the stock is closely held, because petitioner is the 100 percent owner of the stock and has control over it. As we have already considered the burden of joint ownership as a basis for a discount, and this discount is reflected in the net asset value of the corporation and, hence, the value of the stock, we decline to grant petitioner the additional 10 percent discount it *70 requests. To do so would be to adopt this circular argument, an argument we find unpersuasive. The Court is asked to apply its Solomon-like wisdom in determining the fair market values of the subject properties. Unfortunately, this task is often difficult and was truly difficult in the instant case. Neither expert provided us with thorough appraisals. We have considered the bases for the comparables which they have used, the extent to which they investigated the subject properties and comparables, and the assumptions they have made in determining the fair market values. Petitioner's set of appraisals was particularly lacking in credibility. Earlier on, for the Estate of Jay M. Mosher, Crawford's appraisals arrived at market value substantially higher than those arrived at for decedent's estate, yet the decedent died only a short period after her husband. Crawford based the reductions in fair market value on allegedly "new" considerations, but many of these factors were already considered in the various earlier appraisals. Moreover, petitioner's discount analyses were inconsistent and result oriented. Had petitioner simply put forward a logical, rational and consistent basis *71 from the start, the case probably could have been settled and we would not have spent many hours sorting out the arguments. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect as of the date of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Value conclusions were determined as the following: ↩
VALUE CONCLUSIONS
Market Data Approach
Value of Land
$ 158,000
Income Approach
Estimated Gross Annual Income
$  41,000
Estimated Net Annual Income
$  37,800
Capitalization Rate 11.5%
Estimatred Value of Land and Improvements
$ 328,695
Cost Approach
Depreciated Value of Improvements
$ 171,000
Value of Land (Market Data Approach)
158,000
Value of Land and Improvements
$ 329,500
CONCLUSION OF VALUE
$ 329,000
3. This is over $ 100,000 less than his appraisal 1 year earlier for the Estate of Jay M. Mosher, the greatest part of that figure presumably reflecting a change in "use" from bank to offices, and not a change in interest rates. ↩
4. Crawford stated that the Mosher Construction Corporation was required to manage the property, which in turn lessened their interest below 50 percent. Therefore, he concluded, the corporation did not have a controlling interest and was entitled to a discount of not less than 10 percent to reflect this fact. ↩