ESTATE OF CHARLES RUSSELL BENNETT, DECEASED, EVA F. BENNETT AND DON R. PAXSON, CO-EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Bennett v. Commissioner
Docket No. 8052-89
United States Tax Court
T.C. Memo 1993-34; 1993 Tax Ct. Memo LEXIS 47; 65 T.C.M. (CCH) 1816; February 1, 1993, Filed *47 For Petitioner: Lester G. Fant III and John Wester. For Respondent: Judy Jacobs Miller and Chalmers W. Poston, Jr.
PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's Federal estate tax of $ 2,716,879 [1] and an addition to tax of $ 80,415. The issues for decision are (1) the fair market value of 100,000 shares of stock in Fairlawn Plaza Development, Inc. on the date of death of Charles Russell Bennett; and (2) whether petitioner is liable for an addition to tax for a valuation understatement under section 6660. *48 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and accompanying exhibits are incorporated herein by this reference. Charles Russell Bennett (the decedent) was a citizen of the United States and a domiciliary of the State of Kansas when he died testate on August 27, 1985. Eva F. Bennett (Mrs. Bennett) is the surviving spouse of the decedent. She and Donald R. Paxson are the co-executors of the Estate of Charles Russell Bennett (the Estate or petitioner). At the time of filing of the petition, the co-executors were both residents and domiciliaries of the State of Kansas. At all relevant times, the Estate has been administered in the District Court for Shawnee County, Kansas, Probate Division. In his will, dated June 6, 1984, the decedent made several specific bequests to Mrs. Bennett and others. The Charles R. and Eva F. Bennett Trust (the Trust) was the residual beneficiary under the decedent's will. The Trust was *49 an inter vivos trust created by an agreement dated June 6, 1984 (the Trust Agreement). The Trust was funded originally with 10,000 shares of Bennett Housing, Inc. stock, with a par value of $ 1 per share. The income of the Trust was payable to the decedent during his lifetime. Upon his death, the Trust was bifurcated into two separate trusts: the Charles Russell Bennett Family Trust (the Family Trust) and the Charles Russell Bennett Memorial Trust (the Memorial Trust). The co-executors of the Estate timely filed a Form 706, United States Estate Tax Return, with the Internal Revenue Service Center in Austin, Texas. Among the assets listed on the estate tax return was the decedent's interest in the Memorial Trust. As of the date of the decedent's death, the principal asset of the Memorial Trust was 100,000 shares, representing 100 percent of the common stock, of Fairlawn Plaza Development, Inc. In preparing the estate tax return, the co-executors valued the Fairlawn Plaza Development, Inc. stock at $ 2,556,000 as of August 27, 1985. Corporation's Operating History
Fairlawn Plaza Development, Inc. (Fairlawn) is a Kansas corporation incorporated in 1960. The decedent had *50 been the founder and 100 percent owner of Fairlawn. At the time of the decedent's death, Fairlawn had been in operation for 25 years as a real estate development company. Its principal place of business is Topeka, Kansas. From its inception until the decedent's death, no Fairlawn stock had ever been held by anyone other than the decedent or a corporation completely controlled by the decedent. Fairlawn operated a neighborhood shopping center and nearby properties known as "Fairlawn Plaza". The unenclosed shopping center, the bank, the Dairy Queen, and the garden center are known as the "Strip". There is also an adjoining, enclosed Fairlawn Plaza Shopping Mall (the Mall) built on land owned by Fairlawn and as to which Fairlawn was the ground lessor. Between 1982 and 1985, real estate rental income represented almost 90 percent of Fairlawn's total income. Fairlawn also actively managed the properties that it owned. Fairlawn did not retain a management company to operate its properties: Fairlawn employees were continuously engaged in maintaining and upgrading the properties, locating and attracting tenants, and arranging financing for and collecting rents from existing tenants. *51 In 1969, Fairlawn had granted a 99-year ground lease for the present site of the Mall to The Hanson Development Company (Hanson). In January of 1971, Fairlawn, as fee owner, and Hanson, as leasehold owner (collectively, the Mortgagors), entered into a mortgage contract with Commerce Mortgage Company (the Mortgagee). In that mortgage contract, the Mortgagors granted the Mortgagee a "prior lien and encumbrance" on the land under the Mall. However, the contract provides that, if Hanson, as lessee under the ground lease, fails to fully perform its obligations to its ground lessor, Fairlawn, the Mortgagee may "(but shall not be obligated to) take any action it deems necessary or desirable to prevent or cure any default" by Hanson. The contract further provides: Upon receipt by Mortgagee from the Lessor under said lease of any written notice of default by the Lessee thereunder, Mortgagee may rely thereon and take any action as aforesaid to cure such default * * * Mortgagors hereby expressly grant to Mortgagee, * * * the absolute and immediate right to enter in and upon the mortgaged premises or any part thereof to such extent and as often as Mortgagee, in its sole discretion, deems *52 necessary or desirable in order to prevent or to cure any such default by Mortgagor Hanson Development Company. Mortgagee may pay and expend such sums of money as Mortgagee in its sole discretion deems necessary for any such purpose, and Mortgagor The Hanson Development Company hereby agrees to pay to Mortgagee immediately and without demand, all such sums so paid and expended by Mortgagee * * * All sums so paid and expended by Mortgagee, and the interest thereon shall be added to and be secured by the lien of this mortgage. Thus, Fairlawn's fee interest was subordinated to the mortgage. [2]
*53 In 1971, Hanson constructed the Mall, which is approximately 200,000 square feet. However, shortly after obtaining the mortgage, Hanson assigned its ground lease to EES Topeka Associates, a Connecticut Limited Partnership (EES). EES employed Brentwood Properties, a property management firm located in Texas, to manage the Mall. In 1977, EES entered Chapter XII bankruptcy proceedings. In 1978, the bankruptcy court confirmed a plan of arrangement (the Plan of Arrangement) that modified the terms of the ground lease and the mortgage. Under the Plan of Arrangement, restrictions were placed on EES's management of the Mall. Fairlawn was given the right to examine EES's books and to receive monthly financial reports. The base annual ground rent was set at $ 57,719 from April 1, 1981, through March 31, 1992, after which time it was scheduled to increase to $ 62,619. The increased rental amounts were to be paid until the end of the lease term. A lump-sum payment of $ 112,704, without interest, was due on April 1, 1992. That lump-sum payment represented an expected shortfall in the contract base rental from April 1, 1978, to April 1, 1992. Also, in addition to base rental amounts, *54 EES agreed to pay a "base percentage rental", a payment equal to 10 percent of all rental income received from its lessees that exceeds $ 505,000 per calendar year. On August 3, 1978, the Plan of Arrangement was confirmed by the United States District Court for the District of Kansas. From 1979 through August of 1985, EES was current on its payments under the ground lease. From 1979 through August of 1985, EES also was current on its payments on the mortgage for the Mall. Starting in September of 1985, a few days after the decedent's death, EES failed to make any payments on the ground lease or on the mortgage. As of January 1, 1986, Fairlawn reacquired the ground lease from EES, and as of August 1, 1986, Fairlawn began paying into escrow the mortgage. [3]
*55 It was public knowledge that Fairlawn Plaza was experiencing many financial difficulties. Those troubles had commenced at least a year or two before the decedent's death. A tenant, Woolco, filed for bankruptcy protection and, under the terms of its lease, was obligated to pay only a minimum rent, without any escalation factor, for the remainder of its lease term. Of particular detriment to the Mall was the erection of a wall by Venture (a sublessee of Woolco) that eliminated the flow-through of customers from that store to the enclosed Mall. During this period, other tenants also were delinquent in making their lease payments, and vacancies increased. Of great concern was another developer's plan to construct a new shopping mall, anchored by several national retailers, within a few miles of Fairlawn Plaza. The Estate's Valuation of the Stock of Fairlawn
Donald R. Paxson, a long-time family adviser and one of the co-executors of the Estate, prepared for the Estate an appraisal report, dated May 26, 1986. That report was prepared in conjunction with the filing of the estate tax return. In drafting that report, Mr. Paxson requested real estate appraisals of the Strip *56 and the adjoining buildings. Appraisal reports prepared by Wm. Michael Rinner and Daniel W. Craig of David Craig and Co. listed fair market values for those assets totaling $ 4,185,000. Based on those appraisal reports and his own analysis, Mr. Paxson reported the 100,000 shares of Fairlawn on the decedent's estate tax return at a date of death fair market value of $ 2,556,000. Mr. Paxson has been a practicing certified public accountant in Topeka, Kansas, for nearly 30 years and possesses a law degree as well. In his practice, he advises clients who are involved in the buying and selling of commercial real estate in the Topeka area. For years, Mr. Paxson has been quite familiar with Fairlawn's business operations and financial condition. [4]
*57 Mr. Paxson considered a variety of methods in valuing Fairlawn's stock pursuant to Revenue Ruling 59-60, 1959-1 C.B. 237. He decided to rely upon three main approaches in valuing Fairlawn's stock: (1) Fairlawn's earning capacity; (2) the liquidation value of Fairlawn's assets; and (3) Fairlawn's dividend-paying ability. He assigned varying weights to the result reached under each method, according to what he viewed as the deemed reliability and accuracy of each particular method used. He then used these weighted results to arrive at an overall valuation figure. First, under the earnings-capacity approach, [5] Mr. Paxson considered a number of publicly traded companies quoted on the New York Stock Exchange that he determined were involved in similar investments or were operating similar real estate businesses. He chose five companies [6] involved in real estate transactions he deemed similar to those of Fairlawn. He determined each company's earnings per share for the years 1981 through 1985. He then weighted the 1985 earnings figure by a factor of 5, the 1984 earnings by a factor of 4, the 1983 earnings by 3, the 1982 earnings by 2, *58 and the 1981 earnings by 1 in order to determine a 5-year weighted average earnings per share for each company. Applying this same method to Fairlawn, Mr. Paxson determined a 5-year weighted average earnings per share of $ 1.29 to be used as a figure of comparison with the publicly traded companies. Mr. Paxson testified that this method often is used to determine and compare the kind of yield, the kind of earnings per share, and the kind of return that an investor could achieve, in terms of both long-term growth and current return, with alternative investments. *59 Mr. Paxson also calculated the price/earnings ratios of the five publicly traded companies plus three additional companies that he considered to be similar [7] and determined an average price/earnings ratio of the comparable companies of $ 24.69. He then multiplied Fairlawn's 5-year weighted average earnings per share of $ 1.29 with the average price/earnings ratio of $ 24.69 to calculate an "earnings factor" of $ 31.92. This earnings factor was then assigned a 50-percent weight in the total valuation, yielding $ 15.96. Second, Mr. Paxson attempted to determine Fairlawn's dividend-paying ability. Since Fairlawn has never paid any dividends, Mr. Paxson equated the payment of dividends to the payment of interest to the decedent, the sole shareholder of Fairlawn. The decedent had made a loan of approximately $ 600,000 to Fairlawn. Mr. Paxson calculated a weighted average interest paid per share of $ .69. He *60 also determined that the comparable companies he had chosen had an average dividend yield of 5.85 percent. From this information, Mr. Paxson calculated an "income factor" of $ 11.70 (interest/yield). This factor was assigned only a 10-percent weight in the total valuation calculation, yielding $ 1.17. Mr. Paxson then determined a "liquidation factor". He determined the fair market value of all of the assets and the liabilities of Fairlawn in order to calculate an estimated per share value upon liquidation of $ 50.52. He then assigned a 40-percent weight to this factor, resulting in $ 20.21. In determining the fair market values of the assets of Fairlawn, Mr. Paxson first adjusted the amount of outstanding receivables to correct what he regarded as bookkeeping errors and then discounted the outstanding balances to reflect the risk of noncollection. The accounts receivable were recorded on the Fairlawn balance sheet as $ 82,175, and that figure was accepted as the fair market value by respondent's expert, Robert P. Schweihs; however, Mr. Paxson ascertained that over half of the receivables were delinquent rents that were more than 90 days in arrears. In addition, Mr. Paxson concluded *61 that many of Fairlawn's notes receivable were uncollectible. Based on his analysis of Fairlawn's receivables, Mr. Paxson valued Fairlawn's total outstanding receivables at $ 231,028 and provided for losses of $ 95,731. Mr. Paxson was aware of the financial difficulties being experienced by EES in satisfying the terms of the Plan of Arrangement. Thus, in determining the fair market value of the ground lease, Mr. Paxson excluded the rent increases and the lump-sum payment scheduled for 1992. Using an 11-percent discount rate, Mr. Paxson calculated the present value of $ 57,719 a year for the remaining lease term. He then further discounted the resulting present value by a total of one-third to establish a value of $ 350,000 for the ground lease and, hence, the value of the land itself. In his valuation of Fairlawn's liabilities, Mr. Paxson made allowances for prorated property taxes and for estimated Federal income taxes. In his appraisal report, Mr. Paxson valued accrued property taxes at $ 14,602 [8] and estimated Federal income taxes at $ 10,000 [9], both of which had not been properly recorded on Fairlawn's balance sheet. After determining net assets less liabilities, Mr. *62 Paxson also deducted estimated costs of liquidation to come up with an estimated net value on liquidation. [10]
By adding the three weighted factors ($ 15.96, $ 1.17, and $ 20.21) together, Mr. Paxson calculated a total weighted value of factors of $ 37.34 per share. He then applied a 15-percent discount for the lack of marketability ($ 5.60) to arrive at an estimated value of Fairlawn's equity and debt of $ 31.74 per share. The resulting value of $ 3,174,000 for the 100,000 shares of Fairlawn was rounded off to $ 3,170,000. This *63 figure was then divided into debt of $ 613,774 and equity of $ 2,556,226. The equity was then rounded off to $ 2,556,000. Respondent's Valuation of the Stock of Fairlawn
Respondent's expert, Robert P. Schweihs, is a senior member of the American Society of Appraisers. He served as the National Director of Valuation Services for Touche, Ross & Co. before starting his own consulting practice, Valuation Economics Associates. His consulting practice is involved in the appraisal and valuation of closely held businesses. We recognize Mr. Schweihs as an expert witness. Mr. Schweihs prepared an appraisal report, dated October 4, 1990, expressing his expert opinion as to the fair market value of the decedent's Fairlawn stock at the date of his death as approximately $ 5,000,000. Mr. Schweihs also followed the guidelines of Revenue Ruling 59-60, 1959-1 C.B. 237, and considered all of the general theories of valuation. He specifically considered four approaches in his valuation: (1) asset-accumulation (or adjusted net worth) approach; (2) discounted-net-cash-flow (or earnings capacity) approach; (3) market-data-comparable (or transactional *64 analysis) approach; and (4) capital-market (or market multiple) approach. The asset-accumulation approach discretely values all of a corporation's assets and liabilities. The value of the business enterprise is then determined by calculating the fair market value of all of the company's assets less the fair market value of all of the company's liabilities. The asset-accumulation approach looks at a business as a going concern that includes assets performing in accordance with a corporate plan. The discounted-net-cash-flow approach (earnings-capacity approach) focuses on the present value of the future economic income to be derived by the owners of the business. This approach estimates the business' future income and expenses, then discounts these projections, using an appropriate discount rate, to determine their present value. The market-data-comparable approach values a business by comparing it to comparable companies that have been bought or sold during a reasonably recent period of time. Sales of similar percentages of the assets or stock of comparable companies are analyzed and applied to the subject company to arrive at an indication of value. The capital-market approach *65 determines the value of an enterprise by estimating the price that reasonable capital market investors would pay to own the stock of the subject company. Capital market ratios of publicly traded comparable companies are compared with similar ratios of the subject company to yield a price for the stock of the subject company. In his report, Mr. Schweihs chose to eliminate the market-data-comparable approach and the capital-market approach in his valuation calculation because he concluded that, despite Mr. Paxson's position, there were no publicly traded or privately held real estate companies that had characteristics similar to Fairlawn. He also eliminated the discounted-net-cash-flow approach because he concluded that the assets held by Fairlawn were of the investment type as opposed to the operating type. He concluded that the cash-flow potential of a holding company is the sum of the cash flows of its underlying assets. Thus, Mr. Schweihs expressed the view that the discounted-net-cash-flow approach need not be applied separately since it has already been considered in calculating the values of the underlying assets. Mr. Schweihs accordingly concluded that the asset-accumulation *66 method gave the most reliable indicator of fair market value in this case. In reaching this conclusion, Mr. Schweihs did not apply discounts for liquidation costs or for lack of marketability. Thus, to determine the fair market value of a 100-percent interest in the common stock of Fairlawn as of August 27, 1985, Mr. Schweihs relied exclusively upon the asset-accumulation approach. In so doing, he determined a fair market value of $ 5,872,734 for the assets of the company and $ 789,181 for the liabilities ($ 5,872,734 - $ 789,181 = $ 5,083,553). As a result, Mr. Schweihs rounded this figure off and concluded that the stock of Fairlawn was worth approximately $ 5,000,000. In response to the Estate's criticism that Mr. Schweihs' valuation methodology was one-sided, Mr. Schweihs testified that other valuation methods, such as the earnings-capacity and the market-data-comparable approaches, are used in determining the fair market values of the individual assets and liabilities. Since the asset-accumulation method itself incorporates more than one valuation approach, Mr. Schweihs is of the opinion that it can be appropriate to rely exclusively upon that one approach. Mr. Schweihs *67 stated that a discount for lack of marketability was not appropriate in this case because there was no illiquidity for stock of a corporation that was 100-percent owned by one person. He also stated that a discount for the costs of liquidation was not warranted because liquidation in this case was only speculative. In his report, Mr. Schweihs stated that Fairlawn provided him with unaudited financial and operational data. He did not audit this data as part of his appraisal and relied upon it as fairly representing the results of the operations and financial position of Fairlawn. In addition, Mr. Schweihs testified that the documentation for the notes receivable was not made available to him, thereby hampering his analysis of those items. Mr. Schweihs later decreased his valuation of the Fairlawn stock to $ 4,600,000 after the parties stipulated to the value of the restaurant and the Strip. [11]
*68 The Court's Valuation of the Stock of Fairlawn
During trial preparation, the parties reached many points of agreement and stipulated the values of most of the assets and the liabilities of Fairlawn. This Court must now find the values of the remaining disputed items. There are four asset items remaining in dispute and two liability items. 1. Accounts and Notes Receivable
Accounts receivable were recorded as $ 82,175 on Fairlawn's July 31, 1985, balance sheet. [12] Notes receivable were recorded as $ 236,575, and a bad debt loss reserve was recorded as $ 38,256. Respondent's expert, Mr. Schweihs, accepted these numbers as recorded on the balance sheet, while the Estate's expert, Mr. Paxson, made adjustments for bookkeeping errors and increased the loss reserve due to increased chances of noncollectibility as of the date of death. We have considered the testimony of both Mr. Paxson and Mr. Schweihs in regard to the risks of nonpayment and their methods of valuing these assets. We conclude that a 30-percent discount for noncollectibility should be applied to the total gross receivables amount as recorded on the balance sheet ($ 318,750), i.e., a discount of $ 95,625. *69 Thus, we find a value of $ 223,125 for accounts and notes receivable after the provision for noncollectibility. 2. Land under Mall (Ground Lease)
In calculating the value of the underlying land on which the Mall is built, we followed the approach applied by both Mr. Paxson and Mr. Schweihs, namely, calculation of the present value of the payments expected under the ground lease. Unlike Mr. Paxson, we included the scheduled increases in rent and the lump-sum payment as contemplated by the Plan of Arrangement. However, we utilized a somewhat higher discount rate of 14 percent to compensate for the risks associated with collection of those payments. [13] Our calculations have yielded a present value of *70 approximately $ 473,000 for the ground lease and, hence, the land. We have not taken any further reductions from this amount for the costs of liquidation because the possibility of liquidation is entirely too remote and speculative. 3. Roscoe Brown Securities
We have accepted Mr. Schweihs' valuation of the Roscoe Brown securities. At the date of the decedent's death, Fairlawn owned *71 54,479.34 shares of the Roscoe Brown Corporation. Fairlawn's holdings of those shares represented a 7.8 percent interest in the equity of the Roscoe Brown Corporation. The most recent Roscoe Brown financial statements in relation to the date of the decedent's death, December 31, 1984, indicated a book value of $ 1,008,721. Fairlawn was subject to a redemption agreement that provided that the shares could be sold back to the corporation for no less than 80 percent of the corporation's book value. Thus, 80 percent of the book value is $ 806,977, and 7.8 percent of that amount yields $ 62,944. Thus, we find that the fair market value of the Roscoe Brown securities was $ 62,944 on the date of the decedent's death. 4. Preferred Stock of J. Benson, Inc.
We also accept Mr. Schweihs' $ 200 valuation of the preferred stock of J. Benson, Inc. Mr. Schweihs' valuation is based upon an entry on the estate tax return filed by Mr. Paxson. 5. Liabilities
With respect to the liabilities in dispute, Mr. Schweihs used the numbers from Fairlawn's July 31, 1985, balance sheet for the accounts payable ($ 950) and the accrued taxes (a positive balance of $ 4,519), with no further calculations *72 or adjustments. Those balance sheet numbers were not reflective of Fairlawn's situation on the date of the decedent's death. Therefore, we accept Mr. Paxson's calculations of the accounts payable ($ 7,865) and the accrued property taxes ($ 14,602) as shown on his report, dated May 26, 1986. Mr. Paxson possessed a greater knowledge of Fairlawn's cycles of accounts payable and Kansas State taxation of property than Mr. Schweihs. However, we do not accept Mr. Paxson's contention regarding a "corrected" accrued property tax figure of $ 26,500. No explanation of the recalculation of this amount or any other substantiation of this "corrected" figure was offered. See supra note 8. In summary we find that, as of August 27, 1985, the values of the assets and the liabilities of Fairlawn were as follows: Current Assets
Value
Cash Equivalents (excludes Bennett
Construction)
$    31,933 Accounts and Notes Receivable (after
provision for noncollectibility)
$   223,125 *
Tax Deposits
$    25,000 Fixed Assets
Strip
$ 3,600,000 Dinkels' Rest. bldg & land
$   265,000 Land under Mall (Ground Lease)
$   473,000 *
Undeveloped Land
$   542,000 Other Assets
Lincoln Town Car
$    12,500 Bennett Construction
$     1,160 Roscoe Brown Securities
$    62,944 *
Industrial Space Available Partnership
Interest
$    16,443 Preferred Stock of J. Benson, Inc.
$      200 *
TOTAL
$ 5,253,305 Liabilities
Accounts Payable
$     7,865 *
Accrued Property Taxes
$    14,602 *
Estimated Income Taxes
$   10,000 Tenant Rental Deposits
$     2,834 Note Payable to Stockholder
(including accrued interest)
$   637,585 Note Payable to Bank
$   103,654 Deferred Tax on Gain
$    55,134 TOTAL
$   831,674 NET ASSETS
$ 4,421,631 *73 Having established the values of Fairlawn's assets and liabilities, we now consider other pertinent information in valuing the corporation's stock. Fairlawn's common stock has never been listed on any stock exchange and has never been traded in any over-the-counter securities market. No known public market exists for the shares of Fairlawn. No sales of Fairlawn stock took place at or near the date of the decedent's death or for several years prior thereto. Fairlawn's earnings per share for the 5 years preceding the decedent's death were as follows: Year Ended
Earnings per Share
4-30-85
$ 1.34
4-30-84
1.58
4-30-83
1.61
4-30-82
.54
4-30-81
.46
Fairlawn has never declared any cash dividends. Thus, in valuing the stock of Fairlawn as of the date of the decedent's death, this Court begins with the adjusted fair market values of the assets and the liabilities as established herein, i.e., the net asset value of $ 4,421,631. Having considered the above factors and *74 other information in the record, we conclude that a discount of 15 percent for the lack of marketability of these shares, $ 663,245, is warranted. As a result, we find the value of the 100,000 shares of Fairlawn stock as of the date of the decedent's death to be $ 3,758,386 ($ 4,421,631 less $ 663,245). OPINION I Valuation of the Fairlawn Stock
Property includable in a decedent's gross estate is generally included at its fair market value on the date of the decedent's death. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value has long been defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts". Sec. 20.2031-1(b), Estate Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551 (1973). Since this is a question of fact, the trier of fact has a duty to weigh all relevant evidence of value and to draw appropriate inferences. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347. *75 However, any knowledge of future events not known or reasonably anticipated on the valuation date (in this case, the date of the decedent's death) that might affect the value of the stock cannot be attributed to the willing seller or buyer. Sec. 20.2031-1(b), Estate Tax Regs.; see supra note 3. Usually, in determining the value of untraded stock, one would look at actual arm's-length sales of such stock in the normal course of business within a reasonable time before or after the valuation date. Duncan Industries, Inc. v. Commissioner, 73 T.C. 266, 276 (1979). However, the stock of Fairlawn had never been publicly traded nor were there any sales of the stock at any time near the date of the decedent's death. Thus, we must determine the value of this closely held stock indirectly, by weighing the corporation's net worth, prospective earning power, dividend-paying capacity, and other relevant factors. Sec. 20.2031-2(f), Estate Tax Regs; Estate of Leyman v. Commissioner, 40 T.C. 100, 119 (1963), affd. in part and remanded on other grounds 344 F.2d 763 (6th Cir. 1965). There are no set *76 weights to be accorded each factor: the weight to be given each factor must reflect the particular facts and circumstances of each case. Messing v. Commissioner, 48 T.C. 502, 512 (1967). General guidelines for valuing the corporate stock of closely held corporations are contained in section 2031(b), which specifies that the value of the unlisted stock "shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." Section 20.2031-2(f), Estate Tax Regs., provides similar valuation guidelines. Revenue Ruling 59-60, 1959-1 C.B. 237, relied upon by the experts for both parties, outlines in general the approach, methods, and factors to be considered in valuing shares of the capital stock of closely held corporations for estate tax and gift tax purposes. The revenue ruling recognizes that a determination of fair market value is a question of fact and will depend upon the circumstances of each case. The ruling instructs an appraiser to apply common sense, an informed *77 judgment, and reasonableness in weighing the specific facts of a case and determining their aggregate significance. Rev. Rul. 59-60, sec. 3.01. Uncertainty as to the stability or continuity of the future income from a property decreases its value by increasing the risk of loss of earnings and value in the future. The value of shares of stock of a company with very uncertain future prospects is highly speculative. The appraiser must exercise his judgment as to the degree of risk attaching to the business of the corporation which issued the stock, but that judgment must be related to all the other factors affecting value. Rev. Rul. 59-60, sec. 3.02, 1959-1 C.B. 238.
The following factors, although not all-inclusive, are fundamental and require careful analysis in each case: (a) The nature of the business and the history of the enterprise from its inception. (b) The economic outlook in general and the condition and outlook of the specific industry in particular. (c) The book value of the stock and the financial condition of the business. (d) The earning capacity *78 of the company. (e) The dividend-paying capacity of the company. (f) Whether or not the enterprise has goodwill or other intangible value. (g) Sales of the stock and the size of the block of stock to be valued. (h) The market price of stock of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market either on an exchange or over-the-counter. Rev. Rul. 59-60, supra sec. 4.01, 1959-1 C.B. 238-239.
There are various methods of valuation that the experts in this case have considered and that we should consider in valuing the stock of Fairlawn. The methods are detailed in our Findings of Fact above. Both parties relied upon experts to consider and analyze the intrinsic factors of Fairlawn and to derive a valuation of the company's stock. However, due to fundamental differences in approach between the parties' experts, particularly with respect to the weight to be placed upon net-asset value as opposed to earnings capacity or liquidation analysis, the valuations determined by the experts were quite far apart. The taxpayer bears the burden *79 of proof in showing that the value determined by respondent in the statutory notice of deficiency is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent bears the burden of proof with regard to any amount in excess of the valuation determined in the notice of deficiency. Rule 142(a). The Court often finds expert witnesses' opinions to be helpful in understanding an area requiring specialized training, knowledge, or judgment. [14] However, as the trier of fact, the Court is not bound to accept the experts' opinions. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may adopt some portions and reject other portions of expert testimony as we weigh its persuasiveness and helpfulness. Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938). "Valuation is * * * necessarily an approximation. * * * It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it *80 is within the range of figures that may properly be deduced from the evidence." Silverman v. Commissioner, 538 F.2d at 933 (citing Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957)). Although Mr. Schweihs' credentials are impressive, and we have put great weight on many of his valuations in this case, the Court is troubled by his reliance on only one method of valuation, the asset-accumulation method, [15] without further adjustments or discounts. Compounding this shortcoming is Mr. Schweihs' exclusive reliance upon the numbers listed on Fairlawn's balance sheets with no further investigation or due diligence. Mr. Schweihs himself acknowledged at trial that a hypothetical willing buyer would look behind the balance sheet numbers in evaluating their correctness and in applying valuation methods. Although Mr. Schweihs stated that he was not able to obtain *81 requested documents from Fairlawn, we feel that Mr. Schweihs did not perform sufficient due diligence in this matter. Finally, we think that, in his report, Mr. Schweihs should have characterized Fairlawn as a corporation actively engaged in commercial real estate management rather than wholly as an investment or holding company. Estate of Andrews v. Commissioner, 79 T.C. 938, 944 and n.10 (1982). *82 Respondent addresses this shortcoming on brief by recognizing that Fairlawn cannot be characterized exclusively as either an operating company or as an investment company. We discussed such a situation in Estate of Andrews. In that case, we rejected the argument that only the asset-accumulation approach should be used in valuing a closely held real estate management corporation. We concluded that "some of the value attached to the corporations must be based upon the operating nature of the businesses, with attention paid to their earnings and dividend history, management, and prospects for growth". Estate of Andrews v. Commissioner, 79 T.C. at 946. On the other hand, although we respect Mr. Paxson's familiarity with Fairlawn's operating difficulties and financial condition, we do not think that his weighting approach properly reflects Fairlawn's stock value. He also relied on five companies significantly larger and more nationally diverse than Fairlawn. Such reliance is only marginally useful to a valuation analysis, even at just a 10-percent weighting. In addition, Mr. Paxson's equating dividend-paying capacity to interest payments on a *83 shareholder's loan does not yield a figure comparable to the dividend-paying capacities of other companies. Finally, we think that Mr. Paxson's weighting method itself mixes the proverbial apples and oranges and does not yield a supportable valuation. Section 7 of Revenue Ruling 59-60, 1959-1 C.B. 243, specifically advises against averaging factors: Because valuations cannot be made on the basis of a prescribed formula, there is no means whereby the various applicable factors in a particular case can be assigned mathematical weights in deriving the fair market value. For this reason, no useful purpose is served by taking an average of several factors (for example, book value, capitalized earnings and capitalized dividends) and basing the valuation on the result. Such a process excludes active consideration of other pertinent factors, and the end result cannot be supported by a realistic application of the significant facts in the case except by mere chance. Thus, where both parties' valuations are defective, the Court independently may reach a valuation determination. Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), *84 affg. T.C. Memo. 1963-244; Goldstein v. Commissioner, 298 F.2d 562, 567 (9th Cir. 1962), affg. T.C. Memo. 1960-276. In this case, we found the values of the disputed assets and liabilities of Fairlawn as described in our Findings of Fact. Briefly, they are as follows. With respect to the accounts receivable and the notes receivable, we accepted the gross receivables amount recorded on the company's balance sheet, but allowed a 30-percent discount for noncollectibility. To approximate the fair market value of the leased land under the Mall, we performed a net present value analysis of the lease payments expected under the Plan of Arrangement, using a discount rate of 14 percent to allow for the increased risks of nonperformance under the Plan. We accepted Mr. Schweihs' values for the Roscoe Brown securities and the preferred stock of J. Benson, Inc. and Mr. Paxson's values for the accounts payable and the accrued property taxes. In the final analysis, the Estate's valuation of the assets and liabilities of Fairlawn does not differ significantly from Mr. Schweihs' valuation, or this Court's valuation. *85 It is in valuing the fair market value of Fairlawn's stock that the real differences in the parties' valuation approaches manifest themselves. In evaluating both parties' arguments in support of their respective positions, this Court has tried to apply the same reasoning we found helpful in Estate of Heckscher v. Commissioner, 63 T.C. 485, 493 (1975): To make a sale of this stock feasible the potential buyer would have to forego some current return on his investment in exchange for an interest in a net worth much more valuable than the price he pays for the stock, and the seller would have to be willing to part with an equity interest in the company for much less than its indicated value in return for something that would produce a greater yield on his investment. * * * The Estate first argues that, in arriving at a value for Fairlawn's stock, adjustments should be made to the value of the company's net assets to reflect costs that would be incurred if the corporation were to liquidate its real estate properties and assets and place them on the market at one time. We do not agree. Both parties have agreed that there was no reasonable prospect *86 of liquidation in this case. When liquidation is only speculative, the valuation of assets should not take these costs into account because it is unlikely they will ever be incurred. Estate of Piper v. Commissioner, 72 T.C. 1062, 1087 (1979); Estate of Cruikshank v. Commissioner, 9 T.C. 162, 165 (1947). Also, this Court has determined that "Whether or not a purchaser of a controlling interest in * * * [a corporation] could liquidate the corporation and sell its assets is immaterial, as there must still be found a purchaser of the stock who would be willing to undertake such a procedure." Estate of Maxcy v. Commissioner, T.C. Memo. 1969-158, 28 T.C.M. 783, 793, 38 P-H Memo. T.C. par. 69,158 at 853 (1969), reversed in part on another issue 441 F.2d 192 (5th Cir. 1971). Our goal of determining the price a willing seller could get from a willing buyer is not assisted by considering what a buyer might eventually realize from the sale of all of the corporation's assets. The Estate also asserts that a valuation of Fairlawn's stock must *87 include a discount for the lack of marketability. Respondent counters that a discount for lack of marketability is never appropriate in the 100-percent-ownership situation. Respondent's position is based upon an opinion that the 100-percent owner (or a willing buyer of the 100-percent owner's interest) has unconditional control over management and the underlying assets and, thus, can force liquidation to obtain direct ownership over those assets at any time. Accordingly, respondent thinks that the underlying assets of a wholly owned company should not be worth less than their net value simply because they are held in corporate form. Respondent relies upon Estate of Jephson v. Commissioner, 87 T.C. 297 (1986) to support that position. In that case, we found that a lack of marketability discount did not apply. The decedent in that case owned all of the stock of two investment companies. The assets of both companies consisted solely of cash and marketable securities. This Court found that the value of the stock of each company was its net asset value reduced by the cost of liquidation. We based this finding on our opinion that "neither the decedent *88 nor her estate nor a hypothetical seller would have sold the stock of either company for less than that which could have been realized through liquidation." Estate of Jephson v. Commissioner, 87 T.C. at 303. We further noted that a hypothetical purchaser would be willing to pay such an amount because he or she, by purchasing the company, would save the brokerage fees that he or she would otherwise pay to acquire approximately $ 9 million worth of marketable securities. Estate of Jephson v. Commissioner, 87 T.C. at 303 and n.3. Each case must be judged upon its own particular facts. Estate of Jephson represents a unique situation in which the decedent's complete ownership of the companies enabled direct ownership of the corporations' liquid assets through a partial or complete liquidation or a dividend in kind. A discount for lack of marketability was not warranted; yet, we still found it necessary to reduce the net asset values of the corporations by the transactional costs that would be incurred in obtaining that direct ownership. The corporate form cannot simply be ignored as respondent would have us do. The *89 benefits and burdens of corporate form are often the very reasons upon which the decision to apply or to not apply a discount for lack of marketability is based. Other cases have presented facts, such as a minority interest or nonliquid assets, upon which we have decided to allow a discount for the lack of marketability. Estate of Andrews v. Commissioner, 79 T.C. 938 (1982); Estate of Piper v. Commissioner, 72 T.C. 1062 (1979). Respondent asserts that these cases do not apply to the case at hand. Furthermore, respondent argues that the two cases that do apply, Estate of Dougherty v. Commissioner, T.C. Memo. 1990-274, and Estate of Mosher v. Commissioner, T.C. Memo. 1988-24, are in direct conflict and that Estate of Dougherty has been decided incorrectly by this Court. We disagree. In Estate of Mosher v. Commissioner, supra, the decedent owned 100 percent of the stock of a corporation that owned 50-percent interests in two office buildings. The decedent's estate requested a 10-percent *90 discount in the value of the buildings for the burdens of joint ownership and a 10-percent discount for the lack of marketability of the stock of a nonlisted, closely held corporation. We applied the 10-percent discount for the burden of joint ownership, but declined to apply an additional discount for lack of marketability of the stock. In reaching this result, we stated that: We have already applied a 10 percent discount to the value of these buildings to reflect the burden of joint ownership. This discount lowered the value of the properties, and thus the net asset value of the corporation. This, in turn, lowered the value of the stock of the closely-held corporation. If petitioner were to sell the properties, the difficulty in finding a purchaser would stem from the joint ownership and not from the fact that the stock is closely held, because petitioner is the 100 percent owner of the stock and has control over it. As we have already considered the burden of joint ownership as a basis for a discount, and this discount is reflected in the net asset value of the corporation and, hence, the value of the stock, we decline to grant petitioner the additional 10 percent discount *91 it requests. To do so would be to adopt this circular argument, an argument we find unpersuasive. Estate of Mosher v. Commissioner, T.C. Memo. 1988-24, 54 T.C.M. 1578, 1591, 57 P-H Memo. par. 88,024 at 160 (1988). In Estate of Dougherty v. Commissioner, supra, a much different factual situation was presented. The decedent in that case had a 100-percent beneficial interest in a trust that owned all of the stock of A.L. Dougherty Co., Inc. The corporation's assets consisted of notes receivable, securities, fixed assets, long-term investments, and partnership interests in real estate, as well as other miscellaneous assets. The estate's appraiser valued each of the assets and liabilities of the corporation, and then concluded that a 10-percent discount for incremental management costs due to the nonhomogeneous nature of the assets was appropriate. The appraiser also applied a 25-percent discount for the lack of marketability. This Court agreed with the application of both discounts in that case because the assets of the company were so varied, consisting of real estate and other nonliquid assets. *92 We specifically pointed to our acknowledgement in Estate of Jephson v. Commissioner, supra, that a discount for nonmarketability may be applicable where the assets of an investment company consist of real estate and other nonliquid assets. The holdings in these two cases are not inconsistent but are based on each case's own peculiar facts and circumstances. In Estate of Mosher v. Commissioner, supra, the decedent could have owned 50-percent interests in two office buildings individually or, as was the case, in the corporate form. We thought that the net asset values of the two buildings should be discounted to reflect the burden of joint ownership. However, we did not think that a further discount was warranted for lack of marketability because, in that case, corporate ownership, as opposed to individual ownership, of the buildings did not affect the value of the stock. In contrast, we found that the corporate form in Estate of Dougherty v. Commissioner, supra, played a significant role. We found that the varied assets of the company would generate management *93 costs that should be taken into account in valuing the stock. Furthermore, we recognized that the value of an interest in an investment company is not always equal to its proportionate share of the company's net asset value. So too in this case, our holding that a lack of marketability discount is warranted is based on a totality of the facts presented. Here, we have a real estate management company whose assets are varied and nonliquid. We think that the corporate form is a quite important consideration here: there is definitely a difference in owning the assets and liabilities of Fairlawn directly and in owning the stock of Fairlawn, albeit 100 percent of the stock. We think some discounting is necessary to find a buyer willing to buy Fairlawn's package of desirable and less desirable properties. Thus, the line of cases in which we have recognized that difficulties arise in holding nonliquid assets in the corporate form, even in the 100-percent ownership situation, is applicable in this case. We have recognized that The lack of marketability discount * * * is designed to reflect the fact that there is no ready market for shares in a closely held corporation. * * * it *94 should be borne in mind that even controlling shares in a nonpublic corporation suffer from lack of marketability because of the absence of a ready private placement market and the fact that flotation costs would have to be incurred if the corporation were to publicly offer its stock. * * * Estate of Andrews v. Commissioner, 79 T.C. at 953. See also Estate of Maxcy v. Commissioner, T.C. Memo. 1969-158 (this Court found that a majority interest of a corporation was worth 85 percent of the underlying assets' fair market value). Thus, we agree with the Estate's assertion that a 15-percent lack of marketability discount should be applied to the value of the net assets of Fairlawn in finding the fair market value of the stock of Fairlawn. The Court's valuation of the assets and liabilities of Fairlawn yields a net asset value of $ 4,421,631. In reaching that figure, we adopted the stipulated values of the assets and the liabilities of Fairlawn. We found the fair market value of each of the remaining disputed items, by applying various valuation methods and by considering the various relevant *95 factors to reflect Fairlawn's financial difficulties. We did not apply a discount for speculative liquidation costs, but we did apply a 15-percent lack of marketability discount. Based upon the record as a whole, we find that the fair market value of 100,000 shares of Fairlawn stock as of the date of death of the decedent was $ 3,758,386. II Addition to Tax for Valuation Understatement
Respondent has determined an addition to tax of $ 80,415 pursuant to section 6660, which states: (a) Addition To The Tax. -- In the case of any underpayment of tax imposed by subtitle B (relating to estate and gift taxes) which is attributable to a valuation understatement, there shall be added to the tax an amount equal to the applicable percentage [16] of the underpayment so attributed. However, before section 6660 applies, there must first be a valuation understatement. Section 6660(c) defines valuation understatement as follows: (c) Valuation *96 Understatement Defined. -- For purposes of this section, there is a valuation understatement if the value of any property claimed on any return is 66 2/3 percent or less of the amount determined to be the correct amount of such valuation. In this case, we have redetermined the correct valuation of Fairlawn's stock to be $ 3,758,386. Sixty-six and two-thirds percent of that amount equals $ 2,505,566. The value claimed on the estate tax return, $ 2,556,000, is not equal to or less than 66 2/3 percent of the correct valuation amount. In other words, the $ 2,556,000 is approximately 68 percent of the correct valuation, and there is no valuation understatement, as defined in section 6660(c). Thus, we do not sustain respondent's determination of an addition to tax under section 6660. The Court's holding on the marital deduction issue is set out in our separate opinion, Estate of Bennett v. Commissioner, 100 T.C.     (1993), also filed this date. Footnotes
1. In the statutory notice of deficiency, respondent determined the date of death fair market value of the Charles Russell Bennett Memorial Trust (the Memorial Trust) to be $ 4,414,075 rather than $ 2,556,000 as reported on the Federal estate tax return. After receipt of an appraisal report, dated October 4, 1990, prepared by Robert P. Schweihs, respondent moved to amend the answer to the petition filed in this case to revalue the Memorial Trust at $ 5,000,000 with corresponding increases in the deficiency and the addition to tax. This motion was granted, and the amendment to answer was filed on October 16, 1990. After stipulations by the parties, respondent again moved for leave to file a second amendment to the answer, reducing the value of the Memorial Trust from $ 5,000,000 to $ 4,600,000. This motion was granted, and the second amendment↩ to answer was filed on December 5, 1990.
2. Fairlawn had to send a written notice to the Mortgagee of a default by Hanson under the lease. The Mortgagee, in its sole discretion, could cure that default. If the Mortgagee chose to cure the default, all such payments by the Mortgagee would be secured by the lien of the mortgage. There is no indication, however, that Fairlawn itself could not undertake to cure any default by Hanson, but that would of course mean that Fairlawn itself would have to bear such expense, and that too would lessen the value of its fee interest. Thus, in valuing the land under the Mall, we must consider these terms of the mortgage and their potentially negative effect on Fairlawn's fee interest.↩
3. After the decedent's death and EES's failure to make its required payments, Fairlawn purchased the Mall and expended almost $ 2 million to rehabilitate it. However, this information will be considered for valuation purposes only to the extent of what could have been known or anticipated on the date of the decedent's death. Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990) (citing Estate of Gilford v. Commissioner, 88 T.C. 38, 52-53 (1987)). See also Ithaca Trust Co. v. United States, 279 U.S. 151, 155↩ (1929).
4. We recognize Mr. Paxson as an expert witness despite his lack of formal credentials as an appraiser. Fed. R. Evid. 702; Grain Dealers Mutual Insurance Co. v. Farmers Union Cooperative Elevator & Shipping Association, 377 F.2d 672, 679↩ (10th Cir. 1967).
5. Mr. Paxson used incorrect stock prices and earnings-per-share figures for the comparison companies in applying the earnings-capacity approach. Furthermore, respondent asserts that Mr. Paxson's methods and the terminology he uses to describe them are not the same. At this stage, we do not attempt to address any of those discrepancies but merely recount Mr. Paxson's method or process of valuing the Fairlawn stock.↩
6. These companies are Southmark Corporation, Weingarten Realty, Inc., IRT Property Company, JMB Realty Trust, and The Rouse Company.↩
7. The additional companies are Vornado, Inc., Newhall Investment Properties, and Grubb & Ellis Company.↩
8. At trial, Mr. Paxson testified that the landlord's share of prorated property taxes as of the date of death would be approximately $ 26,500. He gave no explanation of or substantiation for how he recalculated this amount.↩
9. Respondent has indicated on brief that this amount is reasonable and acceptable.↩
10. Mr. Paxson took a 5-percent discount for commissions, a 25-percent discount for losses on liquidation, and a 3-percent discount for the costs of overhead and sales costs.↩
11. On November 9, 1990, a Statement of Value and Acknowledgement of Instructions was signed by Thomas M. Rule, Wm. Michael Rinner, and Robert C. Taggart. That Statement represents the parties' agreed-upon fair market value of $ 3,600,000 for the Strip as of August 27, 1985. The parties did not adopt the Court's suggestion that they utilize the Tax Court's voluntary binding arbitration procedures (Rule 124) to handle the various valuation issues in this case, possibly because of time constraints. However, counsel for both parties are to be commended for their creative and effective use of a variant procedure in this instance. Counsel for both parties permitted their respective experts to meet and work out an agreement on the value of the Strip. That procedure eliminated much expert testimony and no doubt resulted in a more satisfactory result than could have been achieved by further litigation of yet another valuation issue in this case.↩
12. Under sec. 4.02(c) of Rev. Rul. 59-60, 1959-1 C.B. 237↩, 238, the balance sheet at the end of the month preceding the date of appraisal (here, the date of the decedent's death) should be utilized as well as comparative annual statements for the preceding 2 or 3 years.
13. An 11-percent discount rate was used by both Mr. Paxson and Mr. Schweihs to determine the present value of the ground lease. However, as the Estate's counsel pointed out at trial, this rate is only 0.2 percent higher than the then-current rate on 30-year Treasury bonds, which are normally considered to be risk-free investments. Thus, we have concluded that a higher rate, which more accurately reflects the risks associated with receiving the rent payments and the difficulties experienced by the Mall, is appropriate in this case. Estate of Mosher v. Commissioner, T.C. Memo. 1988-24↩.
*. Disputed items as found by the Court↩
14. Estate of Rodriguez v. Commissioner, T.C. Memo. 1989-13↩.
15. We agree with Mr. Schweihs' assertion that the asset-accumulation method does encompass some of the other methods discussed herein when valuing the individual assets and liabilities of a corporation. However, in order to rely exclusively upon the asset-accumulation method, one should apply those alternative methods to the underlying assets and liabilities in a manner that reflects the list of factors presented for consideration by Rev. Rul. 59-60, 1959-1 C.B. 237↩. We do not think that Mr. Schweihs adequately applied those other methods to reflect Fairlawn's financial difficulties.
16. Section 6660(b) provides the means for calculating the applicable percentage.↩